2021 IL App (2d) 170606-U
Nos. 2-17-0606 & 2-19-0178 cons.
Order filed March 15, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Kane County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 15-CF-1309 |
| | ) | |
| GARY BENNETT, | ) | Honorable |
| | ) | John A. Barsanti, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE BRENNAN delivered the judgment of the court.
Justices Zenoff and Jorgensen concurred in the judgment.

**ORDER**

¶ 1     *Held*:  We affirmed defendant's convictions for first-degree murder and concealment of a homicidal death where: (1) the State presented sufficient evidence upon which the jury could reasonably conclude that defendant was guilty of first-degree murder; (2) the trial court did not abuse its discretion in refusing defendant's proposed nonpattern and modified pattern jury instructions that the State had the burden of proving that the victim was dead and that the death was caused by criminal agency; (3) the trial court did not err in refusing defendant's proposed modified pattern jury instruction on consideration of accomplice-witness testimony; (4) the trial court did not abuse its discretion in refusing defendant's proposed nonpattern instruction that the jury could consider a person other than defendant's statements against penal interest as substantive evidence; and (5) the trial court abused its discretion in admitting two instances of prior-bad-acts evidence against defendant, but the error was harmless. We also affirmed the grant of the State's motion to dismiss and for summary judgment on defendant's petition for relief from judgment under 735

ILCS 5/2-1401 (West 2018)) where the trial court did not err in holding that defendant was not entitled to an evidentiary hearing on his actual-innocence claim.

¶ 2   In this consolidated appeal, defendant, Gary Bennett, appeals his convictions of first-degree murder and concealment of a homicidal death following a jury trial in the circuit court of Kane County. He challenges the sufficiency of the evidence to support his first-degree murder conviction, the trial court's refusal of his proposed nonpattern and modified pattern jury instructions, and the trial court's admission of prior-bad-acts evidence against him. Defendant also appeals the trial court's grant of the State's motion to dismiss and for summary judgment on his petition for relief from judgment under 735 ILCS 5/2-1401 (West 2018)). He contends that an accomplice witness's postjudgment letters to the prosecutors and the trial court judge requesting assistance in preventing the witness's deportation were newly discovered evidence of actual innocence warranting an evidentiary hearing. For the following reasons, we affirm.

¶ 3                          I. BACKGROUND

¶ 4   Defendant was convicted of murdering 36-year-old Keith Crawford. The victim disappeared in the early morning hours of Sunday, August 10, 2014, although his body was never found. On November 3, 2015, defendant was charged by indictment with first-degree murder, armed robbery, and concealment of a homicidal death. There was extensive pretrial litigation, including, in relevant part, the State's successful motion *in limine* to admit two instances of prior-bad-acts evidence against defendant.

¶ 5                          A. Trial Evidence

¶ 6   The trial proceeded on February 22, 2017. The evidence included testimony from police officers, detectives, and FBI agents regarding the investigation; testimony regarding waste collection and landfill operations; expert testimony regarding cell-site activation analysis of phone records; and expert testimony regarding forensic serology and DNA typing. The evidence also

included testimony from the victim's family, friends, and associates; witnesses who were with the victim on the day of his disappearance; and an accomplice witness. At the close of the State's case, defendant moved for a directed verdict; the trial court denied the motion. We recount the evidence presented at trial as follows.

¶ 7                                    1. Accomplice Witness

¶ 8     The accomplice witness was Joan Sebastian Vado. Vado testified that he was born in Nicaragua and had lived in the United States illegally for approximately 12 years. Vado pled guilty to concealment of a homicidal death in connection with this case after agreeing to cooperate with the State. Pursuant to the agreement, if Vado testified truthfully at trial, he would be sentenced to six months in jail and only serve three months. The United States Immigration and Customs Enforcement Agency had allowed a temporary deferment of any deportation proceedings pending the case against defendant. Vado acknowledged that, when he pled guilty, the trial court informed him that the plea could result in deportation.

¶ 9     Vado testified that, in early 2014, he was detained by McHenry police officer Cody Smith for driving without a valid driver's license. Vado acknowledged that a ticket would have required a court appearance where his immigration status would have been discovered. Vado did not want to return to Nicaragua because his wife, former girlfriends, and children were in the United States. Vado testified, however, that he was not afraid of deportation because he was married to an American citizen and thus had the ability to avoid deportation. Vado nevertheless agreed to become a police informant to "look for bad people, people that selling drugs, drug house, stuff like that" in exchange for not being issued a ticket. According to Vado, he neither sold nor bought drugs but witnessed drug sales in bars. Vado testified that he was offered but did not sign a contract to be an informant and never received any payment. He testified that he provided information only

once to the police, in approximately May 2014. However, he also testified that he provided information "from time to time." Vado acknowledged that drug dealers often are armed and retaliate against informants. Regardless, he informed Smith that he witnessed a drug dealer selling drugs in a bar, that he knew the dealer "from the bar," that a person died because the dealer sold the person "something bad," and that Vado "felt bad" that someone died.

¶ 10    Vado testified that he met defendant, also known to Vado as "G" or "Uncle G," in June 2014. In July 2014, he moved into defendant's townhouse on Millbrook Court in Algonquin but did not pay rent. Vado testified that he helped defendant with defendant's automobile dent repair business and that he occasionally helped defendant buy drugs but was not paid. Vado testified that he did not disclose these drug deals to Smith.

¶ 11    At the outset of his testimony, Vado stated that he was afraid of defendant. The trial court instructed the jury at that point as follows:

> "You are about to hear evidence that the defendant has been involved in offenses or conduct other than that charged in the indictment. This evidence has been received on the issue of the reason for [Vado's] alleged fear of the defendant and may be considered by you only for that limited purpose. It is for you to determine whether the defendant was involved in that offense or conduct; and if so, what weight should be given to this evidence on the issue of the reason for [Vado's] alleged fear of the defendant."

¶ 12    Vado proceeded to testify that he was afraid of defendant because defendant carried a nine-millimeter handgun every day and told Vado that he had "shot at a guy" in 2011 and "did time for it." Moreover, Vado testified, in the beginning of August 2014, he saw defendant put a gun to a man's face after the man knocked on the door to defendant's garage. The man was Garrett Meyer; Vado, defendant, Meyer, and other people had been together in a bar earlier in the evening.

¶ 13                    2. The Night Before the Victim's Disappearance

¶ 14    Vado testified that on the evening of Friday, August 8, 2014, Vado, Vado's son, and defendant were at defendant's townhouse. Later in the evening, several other people, including the victim, Ruben Balleno, and Gilberto Padilla, came to the townhouse. Defendant and the victim went into defendant's bedroom, and Vado heard them argue about money and drugs. Defendant asked the victim for drugs. The victim replied: "I'm not gonna give you shit. You owe me money." At one point in the evening, Vado saw defendant give the victim a .45-caliber handgun. Vado also saw the victim give Balleno cocaine. Balleno left to sell the cocaine, and when he returned, he gave the victim money. Defendant was mad and told the victim that he was using defendant's house and "people" to "sell shit" and make money.

¶ 15    According to Vado, at some point during the evening of August 8 or into the early morning hours, Balleno asked Vado if he was going to "Jimmy's" party the following evening. The victim overheard, learned that "Jimmy" was "rich" and there would be several hundred people at the party, and decided to attend. Vado did not know the address but agreed to direct the victim to the house. The victim stayed overnight at defendant's townhouse and left the next morning, Saturday, August 9, 2014, at about 10 a.m. or 11 a.m.

¶ 16    Expert testimony regarding cell-site activation analysis of phone records demonstrated multiple incoming and outgoing calls between defendant's phone and the victim's phone on August 8, 2014, and into the morning of August 9, 2014, and that the victim's phone was in the area of defendant's townhouse during that time period. There were also calls between defendant's phone and Vado's phone and defendant's phone and Balleno's phone.

¶ 17                    3. The Night of the Victim's Disappearance

¶ 18    Vado testified regarding events that transpired beginning in the afternoon on Saturday, August 9, 2014, through the early morning hours of Sunday, August 10, 2014. Expert testimony regarding cell-site activation analysis of phone records from the time period about which Vado testified also was introduced into evidence.

¶ 19                              a. Vado's Account

¶ 20    Vado testified that, late in the afternoon on Saturday, August 9, 2014, the victim repeatedly texted Vado for "Jimmy's" address. Vado agreed to direct the victim to the house. That evening, the victim texted Vado from the victim's car when the victim was outside defendant's townhouse. According to Vado, the victim told Vado to come outside but not tell defendant. Vado testified that he drove his 2006 Chrysler Pacifica to the party, and the victim followed in his car. The Pacifica was owned and financed by Vado's friend, Roberto Campos, but Vado paid Campos the monthly installment and maintained the car in defendant's garage. When Vado and the victim arrived at the party, Vado saw that there was someone laying or crouching down in the passenger side of the victim's car. Vado described the passenger as a "short African-American" man. The evidence established that the address of the house where the party occurred was on Lathrop Lane in West Dundee (Lathrop Lane house). According to Vado, there were four or five hundred people at the party. Vado testified that he followed the victim around the party for a while, unsuccessfully looked for Balleno and Padilla, and left the party because "his friends were drunk."

¶ 21    Vado testified that he returned to defendant's townhouse in the early morning hours of Sunday, August 10, 2014. Defendant became angry when he learned that the victim attended the party. Defendant called someone and was "screaming and yelling" on the phone. Subsequently, defendant told Vado that he had talked to the victim and asked Vado to drive him to the party to

pick up the victim. Defendant said that he wanted to go to the house of his "cousin," Jeff Quagliano, to get money to pay the victim and obtain more drugs.

¶ 22　According to Vado, he drove defendant in the Pacifica to the party at the Lathrop Lane house. When they arrived, defendant called the victim, but the victim did not answer the phone. They waited about 10 minutes. While Vado was urinating outside the car, the victim walked by the car. Defendant jumped out of the front passenger seat and moved into the back seat. The victim sat in the front passenger seat. Defendant told the victim that they had to go to Quagliano's house "to get money and get more shit." The victim, whom Vado described as a "little drunk," agreed to go.

¶ 23　The evidence established that the address of Quagliano's house was on Route 25 in St. Charles. Vado testified that he began driving on Route 31 toward Quagliano's house. They were listening to music and smoking cigarettes. After they drove past Route 72 and the West Dundee Police Department, Vado heard a loud gunshot inside the car. At that moment, the victim's body fell onto Vado's shoulder. Vado testified that defendant shot the victim with a nine-millimeter gun, that Vado could see blood in the back of the victim's head, and that the victim was dead. Vado testified that the shooting occurred on Route 31, close to the police station and a church.

¶ 24　Defendant then "put the gun on" Vado, told Vado to "drive safe" or he was going to "come after" Vado's wife and children, and took Vado's cell phone. Vado was scared, because he had just seen defendant "kill someone next to me." While Vado continued to drive, defendant wrapped the victim's head in a sheet of clear plastic to stop the bleeding. Vado testified that, during the entire time he was in the car with the victim, he never saw the victim's cell phone and never saw defendant take the victim's cell phone.

¶ 25    At that point, Vado testified, he had "a lot of stuff going on" in his mind and was "[n]ot really" concentrating on the route. Defendant told Vado where to drive. Vado testified that he drove the car from Route 31 to Interstate 90 and then to Route 25. When they turned onto the ramp for I-90, however, defendant told Vado to stop the car. Defendant exited the car and tried to pull the victim's body from the front seat to the back seat. When questioned as to the reason he did not drive away at that point, Vado testified, "I don't know, scared." Defendant returned to the car, and they continued to drive. Defendant called Quagliano and said, "Cousin, I be there soon. I got shit." Defendant called Quagliano again as they approached Quagliano's house.

¶ 26    According to Vado, when they reached Quagliano's house, defendant exited the car and appeared to argue with Quagliano. Quagliano looked in the back seat of the Pacifica and said in a surprised tone of voice, "What the fuck is this guy." Defendant pulled the victim's body to the front of the car and took a wallet, money, and a bag of cocaine from the victim's pocket. Defendant and Quagliano smoked the cocaine, wrapped the victim's body in carpet, tied it with rope, and returned the body to the Pacifica. Vado was scared and refused to help, although he cut the rope with a lighter. After about three hours, defendant and Vado returned to the car. Defendant forced Vado to drive. Vado was scared because defendant had threatened his wife and children.

¶ 27    Vado testified that he and defendant drove around to find a place to dispose of the victim's body. They first stopped at a gas station on Randall Road where defendant went into the restroom and then bought cigarettes and a drink. Eventually, at defendant's direction, they drove to an apartment complex "behind McDonald's" near "McLean and Big Timber." According to Vado, defendant said that he wanted to find a "ghetto" place to dump the body. Vado's wife and child lived near there. Defendant told Vado to back up the car close to a garbage dumpster in the parking lot. Defendant "flipped" the victim's body into the dumpster in "parts," maneuvered the body by

the feet, then jumped in the dumpster, and covered the body with garbage. Vado testified that he refused to help defendant, although he testified that he touched the dumpster's lid.

¶ 28    They subsequently drove to another gas station where defendant bought a drink and cigarettes, obtained plastic garbage bags, put the victim's shoes and wallet in a bag, and attempted to clean the blood in the car. At this point, they returned to defendant's house; on the way, defendant returned Vado's cell phone. Vado parked the Pacifica in the garage. Vado testified that defendant was nervous and high. Defendant went to the backyard, where he burned the victim's wallet and identification on a grill. It was approximately 6 a.m. or 6:30 a.m. at this point. Defendant was still doing cocaine and called someone. Defendant also dismantled the gun, buried it in the backyard, but dug it up later that day.

¶ 29    Vado testified that he called his girlfriend Samantha Hedenstrom at about 6:30 a.m. or 7 a.m. The evidence demonstrated that Hedenstrom had called and texted Vado multiple times throughout the early morning hours of Sunday, August 10, 2014. Hedenstrom testified that she was at the police station at the time and needed a ride home because she had been the passenger in her friend's car when her friend was pulled over for driving under the influence. The incoming and outgoing activity on Vado's phone beginning at 5:39 a.m. showed that it was in the location of defendant's townhouse in Algonquin. Defendant's phone was likewise there at that time.

¶ 30    The record demonstrated that Quagliano died prior to defendant's trial. However, Quagliano's acquaintance, Todd Nord, testified that on August 10, 2014, at approximately 4 a.m. or 5 a.m., Quagliano called him and, sounding anxious, said "there was something crazy that happened." According to Nord, the call lasted 30 to 45 seconds. After acknowledging his statement to police, Nord also recalled that Quagliano told him that "Gary just showed up with a car and some bullshit" and would not leave despite Quagliano's request. "Gary," according to Nord, was

a reference to defendant. Nord testified that the call woke him; he was "half-awake" and "groggy" during the brief call; and that he had no clear memory of the conversation. The evidence showed two calls from Quagliano's phone to Nord's phone on the morning of August 10, 2014: a seven-minute call at 5:21 a.m. and a two-minute and 40-second call at 5:32 a.m.

¶ 31                                    b. Cell-Site Activation Analysis

¶ 32     Expert testimony regarding cell-site activation analysis of phone records demonstrated the communications of the victim's phone, Vado's phone, and defendant's phone on the evening of Saturday, August 9, 2014, and into the early morning hours of Sunday, August 10, 2014. Starting with Saturday night, August 9, 2014, there were inbound calls from the victim's phone to Vado's phone as well as subsequent communications between the victim's phone and defendant's phone. The activity also showed that from 11:21 p.m. to 11:40 p.m., the victim's phone was in the vicinity of defendant's townhouse in Algonquin and called defendant's phone three times. Around this time, there were several text messages between Vado's phone and the victim's phone.

¶ 33     Moving into the early morning hours of August 10, 2014, between 12:25 a.m. and 12:38 a.m., there were four text messages from the victim's phone to defendant's phone. Defendant's phone then called the victim's phone at 1:08 a.m., 1:09 a.m., 1:53 a.m., and 1:54 a.m. Meanwhile, defendant's phone also called Quagliano's phone at 1:48 a.m. Defendant's phone was still in the area of his townhouse in Algonquin at this time.

¶ 34     Cell tower records showed that at around 1:48 a.m., defendant's phone moved to the Lathrop Lane area. At 1:57 a.m., defendant's phone called the victim's phone from the Lathrop Lane area. From 2:06 a.m. to 2:12 a.m., defendant's phone called the victim's phone seven times; both phones were in the Lathrop Lane area. At 2:17 a.m., defendant's phone called Quagliano's phone again from the Lathrop Lane area. Meanwhile, between 2:01 a.m. and 2:12 a.m., Vado's

phone was being used in the same area with a phone call from defendant's phone to Vado's phone at 2:01 a.m.

¶ 35    The last outgoing activity on the victim's phone was a 2:19 a.m. text message to his friend's, Lashawntae Dyson's, phone. Cell tower records showed that the victim's phone and defendant's phone were south of the Lathrop Lane area at this time—indicative of "simultaneous travel" from north to south. An incoming text message to the victim's phone at 2:22 a.m. showed that the victim's phone was near the intersection of Route 31 and I-90. At 2:27 a.m., Vado's phone was near Route 25 and I-90. At 2:41 a.m., the victim's phone was in the same vicinity but appeared to "stop" near I-90.

¶ 36    An unanswered incoming call to Vado's phone at 2:43 a.m. showed that his phone was just north of Quagliano's house. A 2:45 a.m. call from Quagliano's phone to defendant's phone showed that defendant's phone was in the same area. Later, between 2:46 a.m. and 4:34 a.m., there were incoming calls and text messages to Vado's phone showing its location near Quagliano's house. Between 3:22 a.m. and 4:16 a.m., defendant's phone was in the same location.

¶ 37                              4. Reports of the Victim's Disappearance

¶ 38    The victim's mother, Regina Myles, testified that, at the time of his disappearance, the victim lived with her at her house in Bartlett. They saw each other every day. The victim had five children, three of whom he saw regularly. On Friday evening, August 8, 2014, at about 8 p.m. or 9 p.m., the victim took Myles's car, a 2009 Toyota Matrix, and left home. He returned the next morning and then left again in the car at 9 p.m. or 10 p.m. on Saturday evening, August 9, 2014. Myles never saw or heard from the victim again. She called his cell phone but received no answer. Myles was alarmed when the victim did not return home on Sunday, August 10, 2014, and told

friends and relatives that he was missing. Early on Monday morning, August 11, 2014, she reported him missing to the police.

¶ 39     The mother of two of the victim's children, Shanicka Lynch, testified that she maintained regular and consistent contact with the victim since she first met him in 2000; she was never out of contact with him for more than three or four days; and the victim never went into hiding. Although she and the victim stopped living together in 2006, the victim still visited her home and saw the children every day. Lynch spoke with the victim by phone on August 9, 2014, at about 6 p.m., and they texted each other later that evening. However, Lynch testified, neither she nor the children have had any communication with the victim since the evening of August 9, 2014.

¶ 40     The mother of two of the victim's other children, Barbara Latek, testified that she had known the victim for 13 years. Latek and the children lived in Florida, but she and the victim had daily contact by phone or text message. On August 9, 2014, Latek received a call from the victim at approximately 10 p.m., but she was unable to answer the phone. She attempted to call the victim back at 10:07 p.m., but the call went straight to voicemail. Since that time, she has had no communication with the victim.

¶ 41     The victim's friend, Lashawntae Dyson, testified that she was at the Lathrop Lane party on the night of August 9, 2014, and into the early morning hours of August 10, 2014. Dyson reconnected with the victim whom she had not seen for 13 years. Dyson received text messages from the victim at 1:52 a.m., 2:17 a.m., and 2:18 a.m. After Dyson sent a text message to defendant at 2:41 a.m., the battery in her phone died. Dyson went to sleep. When her phone had power again several hours later at 10:04 a.m., a text message from the victim "popped up." She texted the victim but never heard from him again.

2021 IL App (2d) 170606-U

¶ 42    George Lambropoulus testified that he occasionally purchased marijuana from the victim. On the morning of August 9, 2014, he met the victim behind a store in Algonquin and purchased marijuana from him. He never saw the victim again.

¶ 43    An analysis of the victim's cell phone records reflected numerous outgoing calls and text messages in the days preceding his disappearance, but only six outgoing calls and seven outgoing text messages on August 10, 2014. After 2:19 a.m. on August 10, 2014, there were no more outgoing communications from the victim's phone.

¶ 44                              5. Prior-Bad-Acts Evidence

¶ 45    A few days after the murder, Bartlett police officers spoke to Vado about the victim's disappearance. However, Vado told them that he did not know anything. Vado testified that he lied because he was scared that something bad would happen to him or his family.

¶ 46    The trial court allowed the State to introduce evidence of two instances of defendant's past conduct and reiterated the instruction set forth above that the jury could consider this evidence only for the limited purpose of showing Vado's alleged fear of defendant. The first instance was defendant's 2011 conviction for attempted reckless discharge of a firearm following his guilty plea. A certified copy of the conviction was admitted into evidence, and Roselle police officers testified regarding the underlying investigation. Namely, on April 6, 2010, at 1:52 a.m., there was a report of a suspicious vehicle and gunshots fired in an alley behind a commercial and residential building. Defendant was questioned and admitted to shooting the gun accidentally and not in the direction of people or buildings. The second instance was testimony from defendant's acquaintance, Garrett Meyer. Meyer testified that, in early August 2014, defendant invited him to an after-hours party at his home. When Meyer knocked on defendant's garage door, defendant

opened the door, put a gun to Meyer's head, ordered him to his knees, and asked him to identify himself. Once defendant knew Meyer's identity, defendant withdrew the gun.

¶ 47                                    6. Initial Investigation

¶ 48    The police initially investigated the matter as a missing-person case with suspicious circumstances. Police searched the Fox River and a forest preserve near the Lathrop Lane house for a body, weapon, cell phone, or clothing. Nothing was recovered. The police attempted to access the video camera system at the Lathrop Lane home but were unsuccessful in obtaining the password to the system. As part of the investigation, Bartlett police detectives conducted a noncustodial interview of defendant at the Bartlett police station.

¶ 49                                    a. The Victim's Home

¶ 50    On August 11, 2014—the day Myles reported the victim missing—Bartlett police officers went to Myles's home. Two men with whom Myles was familiar, Chance Cager and Frank Dobbs, also came to Myles's home that day when the officers were there. Myles testified that she invited Cager and Dobbs into her home. However, they remained at the bottom of the stairs and conversed with a police officer who was standing at the top of the stairs.

¶ 51    On August 20, 2014, Bartlett detectives and an FBI agent went to Myles's home and searched the victim's bedroom. They found $13,000 in a pair of pants hanging in the closet.

¶ 52                                    b. The Victim's Car

¶ 53    On August 12, 2014, the Kane County Sheriff's Office located the Toyota Matrix on Lathrop Lane. Myles retrieved the car and subsequently provided it to the Bartlett police department for processing. Myles testified that when the victim drove the car, he moved the driver's seat backward and left it in that position. However, when she retrieved the car, the driver's seat was moved forward.

¶ 54    A Bartlett police officer and evidence technician testified regarding her August 13, 2014, examination of the Toyota Matrix. She was told that the case was an active missing-persons case; she was not told that the case was a possible homicide. She did not see any indication of "foul play" in the Toyota Matrix. There were partial fingerprints on the outside of the Toyota Matrix; there were smears reflective of an apparent attempt to wipe something off the driver's side window; and there was dust on the rear quarter panel of the driver's side reflective of an apparent attempt to wipe something through the dust. Multiple brownish spots found on the driver's side window were presumptively tested for blood but were negative. The car was never swabbed for DNA nor dismantled. Inside the car were an unopened bottle of Miller Genuine Draft and an opened, partially full water bottle. The bottles were never dusted for fingerprints nor swabbed for DNA. The parties stipulated that, if David Garcia were called to testify, he would testify that he was the victim's best friend, that he never saw the victim drink beer, and that he has neither seen nor heard from the victim since August 9, 2014.

¶ 55                    c. The Victim's Cell Phone

¶ 56    The victim's cell phone was not recovered. However, evidence was introduced that, on August 14, 2014, the victim's cell phone was turned on and issuing data in a residential area near I-90 and Route 25. Bartlett police detective Peter Rakiewicz testified that the first "ping," or cell-site tower activation, was between 7:30 p.m. and 9 p.m. in the vicinity of 810 Parkway Drive in Elgin, with a certainty factor of 1400 to 1500 meters. There was a second ping that evening in the vicinity of 1325 Blackhawk Drive in Elgin, with a certainty factor of 41 meters. After doing a "CLEAR" search, Detective Rakiewicz directed police officers to 1336 Blackhawk Drive in Elgin. Shortly after the police arrived in the area, the pings stopped. Police officers searched the area but found neither the victim nor his cell phone.

¶ 57    The parties stipulated that if Darius Holmes were called to testify, he would testify that on August 14, 2014, he lived at 1336 Blackhawk Drive in Elgin. He had neither seen nor spoken to the victim in over four years; he did not have the victim's cell phone; and the victim was not in Holmes's residence on August 14, 2014.

¶ 58                              d. The Victim's Storage Locker

¶ 59    The evidence established that the victim shared a storage locker with Chris Driver at a storage facility in Schaumburg that Driver managed. Both Driver and the victim had a key. Driver testified that the victim sold him small amounts of marijuana but that he had not seen the victim since early August. The victim's mother, Myles, visited the storage facility after the victim's disappearance and told Driver that she was looking for something that belonged to the victim. However, Driver testified, after leaving the locker, Myles told him that she did not find the item for which she was looking. Driver subsequently went into the storage locker and found a duffel bag full of marijuana. He called Myles and told her that he thought he found the item for which she was looking. Parenthetically, Lynch (the mother of two of the victim's children) testified that, at the beginning of August 2014, she was at the victim's house, that he had a duffle bag with a large amount of marijuana, and that he usually carried about $1500 in cash on his person.

¶ 60    On August 30, 2014, Myles went to the storage locker, recovered the duffle bag, and brought the duffle bag to the Bartlett police station. A Bartlett police officer testified that he met Myles at the police station; she brought a duffel bag containing individual sealed bags of marijuana, some "white bags," baggies, scissors, and a scale. The parties stipulated that 21 grams of cocaine and 3000 grams of cannabis were found in the storage locker.

¶ 61    An FBI agent testified regarding a subsequent September 4, 2014, search of the storage locker. A "Glock .45" and ammunition were found inside a suitcase. Driver testified that, during

the search, a gun had been recovered from a "dresser" that belonged to the victim. However, Driver testified, after the victim's disappearance, he checked the "dresser drawer," and it did not contain a gun. According to Driver, the gun was discovered after Myles and her daughter had gone into the storage locker.

¶ 62                                          e. Chance Cager

¶ 63    Star Blackburn testified that she was acquainted with Cager and during the three-month period before the victim's disappearance, she saw him daily. Cager would visit her home in Hanover Park to drink alcohol and smoke marijuana with Blackburn and Blackburn's roommate, Tamara Smith. According to Blackburn, Cager never paid for anything and "basically lived off us." On August 10, 2014, Cager and his brother came to Backburn's home. Cager told her that he had gone to a party with the victim, nicknamed "Box," in the victim's mother's car but that the victim had disappeared. Cager showed Blackburn a stack of "tens and twenties" and was willing to pay for alcohol and marijuana. On August 11, 2014, Cager returned to Blackburn's home and told her that he would not be surprised if the victim was found in the forest preserve across the street from the party. He also told her that the victim's phone and car were found in the woods. During subsequent discussions about the victim's disappearance, Cager never initiated the topic.

¶ 64    The parties stipulated that, if Smith, Blackburn's roommate, were called to testify, she would testify that she first learned about the victim's disappearance from David Garcia on August 11, 2014. On August 11, 2014, or August 12, 2014, she had a conversation with Cager at her home. Blackburn and two other individuals, Jamarr Payne and Keith Rhodes, were present during the conversation. Cager told Smith that he was selling drugs with "Keith Crawford" at the party and that "Keith" had "about $2000 on him and some 'work.' " At some point in the night, they "split up to go and make deals and that was the last he ever saw of Keith." Cager said that "Boxhead"

went to the party with him and was now missing. Cager quickly changed the subject when Smith asked the real name of "Boxhead."

¶ 65    The parties stipulated that, if Clarence Bush were called to testify, he would testify that he went to Cager's house "after learning Keith went missing to question him about the party because Chance went there with Keith." Bush "asked Chance what happened because he drove to the party with Keith but did not drive home or leave the party with Keith." Cager stated that he did not know what happened to the victim "because they were good with protection." Bush asked Cager what he meant by protection, and Cager stated that "his 'boys' arrived at the party with some guns." Cager further told Bush that "his 'boys' arrived and opened up their trunk which contained a shotgun and a pistol." Cager neither stated the "boys'" names nor described their car.

¶ 66    Bartlett police detective David Smith testified that he interviewed Cager in front of Cager's home on August 12, 2014, after Cager refused Smith's suggestion to be interviewed at the police station. Detective Smith identified Cager as an African American male between 5 feet, 8 inches to 5 feet, 9 inches tall. Cager discussed accompanying the victim to the August 9, 2014, party. Specifically, Cager and his friend, "Lucky," met the victim at the Shell gas station in Hanover Park at about 9:30 p.m. on August 9, 2014. The victim was driving his mother's car and was with a man Cager described as Hispanic, a "very good friend" of the victim, and always at the victim's house. The victim and his passenger led the way to the party, and Cager and Lucky followed behind in Lucky's car.

¶ 67    Cager told Detective Smith that he left the August 9, 2014, party twice. The first time was at around 3 a.m. At that time, the victim was still at the party. Cager went to his girlfriend's, Sara Rhodes's, home in Carpentersville to get more beer. After Cager returned to the party, he hung out by the pool and the driveway. He said the victim, nicknamed "Box," had marijuana on his person,

but not cocaine. During the party, a woman accused Cager of stealing her cell phone. At some point, his cell phone battery died, and he borrowed a cell phone from someone at the party to call Rhodes to ask her for a ride home. Cager said that he helped the homeowner clean up in the morning.

¶ 68     Detective Rakiewicz testified that he interviewed Cager by phone on August 14, 2014. Cager told him that he and the victim arranged to go to the party together and again said that he and Lucky met the victim before the party at the Shell gas station in Hanover Park. The victim was driving his mother's car and had a "male Hispanic" passenger. Cager and Lucky, in Lucky's car, followed the victim and his passenger in their car to the party. Cager said that, when he went to the party, he was "pretty messed up, intoxicated." At the party, he "was just hanging out with Keith by the pool" and, at some point, two unknown women whom he described as black "hung out with them." When the women left, the victim said that he had to "take care of some business and he'd be back." Cager said that a woman and her brother then accused him of stealing the woman's cell phone. Cager told Detective Rakiewicz that he stayed overnight at the party, helped clean up, and at 9:30 a.m. had a conversation with the woman who accused him of stealing her phone. Cager further stated that he did not leave the party until 12:30 p.m. on Sunday, August 10, when his girlfriend, Sarah Rhodes, picked him up.

¶ 69     Detective Smith testified that he obtained the store video from the Shell gas station in Hanover Park. The video did not show Cager, the victim, or their cars. Detective Smith also interviewed Rhodes.

¶ 70     Detective Smith interviewed Cager again on August 15, 2014, in front of Cager's home. Cager denied that he was selling drugs at the party and said that the victim had cocaine at the party. When confronted with the inconsistent gas station video and Rhodes's account, Cager admitted

that he drove to the party with the victim, that he was drinking Miller Genuine Draft in the victim's car, and that he did not go to Rhodes's house to get beer. Detective Smith asked the reason for the inconsistent stories. Cager said that he was "very intoxicated" on the night of the party. Detective Smith testified that Cager did not appear intoxicated during the interview. Cager said that he left the party at around 11 a.m. the next morning when Rhodes picked him up. A video from a gas station near the location of the party showed Cager and Rhodes there at 11:45 a.m. on Sunday, August 10, 2014.

¶ 71    The parties stipulated that if Rhodes were called to testify, she would testify that she was Cager's girlfriend; that no one came to her house at 3 a.m. on August 10, 2014; that the door was locked and Cager did not have a key; that Cager had never entered the house without her knowledge; that the dog would bark if anyone entered; and that there was no beer in the house. Rather, on "Saturday" morning, Cager called her at around 9 a.m. She picked up an "extremely intoxicated" Cager and another man at the intersection of Route 31 and an unknown street.

¶ 72    The parties stipulated that if Krista Robson were called to testify, she would testify that in "late August or early September," Cager told her that he was "thinking of leaving the state for a while, while the police investigated the missing person." Robson told him not to leave because it would look suspicious. According to Robson, "[she] never knew Chance to carry a gun on him."

¶ 73                              f. Ruben Balleno

¶ 74    Balleno testified under a grant of use immunity. (According to Vado's testimony, Balleno was one of the people at defendant's townhouse on the night of Friday, August 8, 2014, and one of the people for whom Vado looked when he arrived at the Lathrop Lane party on Saturday night, August 9, 2014). Balleno was arrested on September 16, 2016, for possession of cocaine and spoke to the police in a recorded interview. Balleno testified that, in a 15-minute conversation before the

recording began, West Dundee police detective Kyle Ficek told him that defendant was in jail. Balleno testified that he was "under pressure" and under the influence of alcohol and cocaine at the time. According to Balleno, it "seemed like" Detective Ficek would help him with his drug case if he spoke about the victim's disappearance.

¶ 75    Balleno testified that Vado had supplied him with cocaine in the past and that he met defendant through Vado. Balleno recalled that he was at defendant's home on the evening of Friday, August 8, 2014. He did not recall that defendant asked him for drugs or talked to him about drugs. After he was confronted with his statement to police, Balleno testified that, in a phone call, he asked defendant for cocaine, not the other way around. Defendant said that he could get the cocaine from an unnamed person. Later that evening, Balleno went to defendant's house, and defendant sold him cocaine for $50. Balleno did not recall seeing the victim at defendant's house on August 8, 2014, but acknowledged that in his statement to police, he said that he did.

¶ 76    Balleno testified that, about a week after August 8, 2014, he went to Little Caesar's Pizza, where Vado worked, to meet Vado. He had called Vado to get cocaine, but both Vado and defendant were there in the Chrysler Pacifica. Balleno testified that he gave $300 to Vado for cocaine. Balleno did not recall telling police that defendant brought him drugs from the "gold Chrysler" in which the two had arrived. However, he acknowledged his statement to police that he gave $300 to defendant. Balleno testified that he tried to tell Detective Ficek about Vado but that Detective Ficek continued to question him and tried to "twist [his] words up" to make him implicate defendant as the person who supplied the cocaine.

¶ 77    The tape of the recorded interview was played for the jury. On recross-examination, the trial court granted defense counsel's request to go beyond the scope of the testimony to question Balleno about the August 9, 2014, party at the Lathrop Lane home. Balleno's close friend, James

Porreca, lived at the Lathrop Lane home. There were hundreds of guests at the party. At about 2 a.m., Porreca told all the guests except a few close friends to leave. About 10 people, including Balleno, remained at the party. Balleno identified "Chance" from a photograph. Balleno testified that neither the victim nor "Chance" were included in the 10 remaining people at the party. He did not recall whether he saw the victim and "Chance" leaving by the lion statues in front of the house but acknowledged that he might have said this in his recorded September 16, 2016, interview, and acknowledged that he did say this in a February 27, 2015, interview with Bartlett detectives.

¶ 78                              7. Defendant's Move to Colorado

¶ 79    Defendant moved to Colorado at some point after the victim's disappearance. In November 2014, both defendant and Vado were charged in McHenry County with felony deceptive practice. In late November 2014, Vado went to Colorado and stayed with defendant for three or four days until defendant left to live with a woman named "Nicole" (whom defendant later married).

¶ 80    Vado testified that defendant left him in Colorado without any money. Therefore, on December 13, 2014, he contacted Officer Smith—the police officer for whom he had been an informant—and reported to Officer Smith that defendant was bringing marijuana and a gun to Chicago. According to Vado, the gun that defendant was bringing was the gun used to shoot the victim, although at that point, he did not report the murder to Officer Smith. Vado said that he took two pictures of the gun—one when it was in Colorado and one when it was in the kitchen of defendant's Algonquin home. Vado sent both pictures to Officer Smith. Vado testified that he wanted defendant to "get caught." When questioned as to the offense for which he wanted defendant to "get caught," Vado responded "to the murder" because "it was bad." Vado was able to monitor on his cell phone the location of defendant's cell phone through the "Life 360"

application that allows people to share their location through their phones. Defendant's phone had accepted Vado's invitation to join "Life 360" on September 28, 2014.

¶ 81 Village of Algonquin Police Officer Timothy Cooney testified that, on December 13, 2014, at about 7:14 p.m., he made a traffic stop at the intersection of Millbrook Drive and Millbrook Court (defendant's street) in Algonquin. Defendant was the passenger in the car, and there was a "female driver." Officer Cooney made the stop based upon information he received from Officer Smith regarding the transport of cannabis and a gun. A search of the glove compartment and trunk lining of the car revealed a small amount of what later tested positive for cannabis. The search also revealed a black and silver 9-millimeter Ruger handgun. Defendant stated that the gun belonged to him, that he and his female companion were travelling from Colorado, and that the gun was for their protection. Officer Cooney photographed the gun; the photographs were introduced into evidence. The gun was not "broken down" for transport as required by law. Thus, Officer Cooney "broke it down" and returned the gun to defendant. Defendant was not arrested and later returned to Colorado.

¶ 82 Vado subsequently returned to Illinois and moved into his girlfriend's, Jennifer Fudala's, home in Lake of the Hills.

¶ 83                                   8. Vado's Arrest for Retail Theft

¶ 84 On March 8, 2015, Vado was arrested in a Schaumburg mall for retail theft. While under arrest, he was processed on the outstanding warrant for felony deceptive practice and transported to McHenry County jail. He was also charged with a class four felony for the retail theft. Vado testified that he asked defendant to post his bond, but defendant refused.

¶ 85 There was a series of text messages between Vado and defendant in the ensuing month. In a March 22, 2015, text message, Vado wrote: "He'll nop I'm not g getting me in trouble with

Bartlett pd, and McHenry Cook County. I'm so fuck so I just need the money before I have court tomorrow if you don't bring the money I'm going back to jail and that's not can happened." On March 22, 2015, defendant texted: "Answer phone nephew!!! DON'T THREATON BRO… JUST DONT GO DOWN THAT ROAD WITH US MAN!!! BARTLET IS JUST REACHING OUT TO ANYONE THEY ALREADY SPOKE TOO…N ASKED ME BOUT SOME CARS HE OWNED YRS AGO…BUT YOU NEED TO CHILL FUKING OUT. I GOT JENS ADDRESS WILL SEND JEFF BY TO SEE YA TONIGHT IF DONT HEAR BACK!" Defendant subsequently texted: "U must speak to me later on Nikki phone. Will text u round 5:30 bro And send Jeff with cash 4 u cuz he wants to remind u of few things b4 court." Defendant further texted: "I'm trying to help you as I always did! SO STOP ACTING LIKE A FUKING IDIOT N THREATENING ME CUZ THAT WILL NOT HELP U IN LONG RUN. U PISS OFF MY FAMILY VERY MUCH BY SAYING SHIT BOUT ME TO COPS OR ANYONE… U KNOW THEY DONT LIKE THAT SNITCHING SHIT… CHILL OUT WITH UR COURT SHIT LIKE U R ONLY 1 EVER HAD COURT B4! CALL U LATER."

¶ 86    Around the same time, Vado's girlfriend, Jennifer Fudala, received a voicemail message from defendant, which was played for the jury. In the message, defendant said, *inter alia*: "[D]on't give people the wrong impression that you're fucking threatening me because I don't take threats very fucking lightly." Defendant further stated in the voicemail message: "[T]hat's the last thing anybody wants to do is fucking threaten me, especially Sebastian." Defendant continued: "I'm getting really aggravated over here. *** Tell him to answer his fucking phone. *** If I can't get through to him I'll send my cousin or somebody by over to your house so that I can get him on the phone."

¶ 87    The next day, on March 23, 2015, defendant texted: "Don't end up like all the other snitching as pussys!! DON'T MENTION MY NAME TO ANYONE IN COURT OUT OF COURT I DON'T CARE…U & I WERE ISSUED PAYCHECKS FOR WORK WE DID BOTTOM LINE."

¶ 88                    9. Vado's Cooperation with the State

¶ 89    On August 9, 2015, Vado met with Bartlett police detective, told them about the murder, and agreed to cooperate with police in the investigation.

¶ 90                    a. Route Driven After the Murder

¶ 91    Vado described to detectives the route he drove after the shooting and also drove the route with detectives on April 9, 2015. The route he described at this point did not include travel on I-90. He maintained this version of the route in subsequent interviews with police over the next few months. However, tollway records reflected that, on August 10, 2014, at 2:25 a.m., a 2006 Chrysler Pacifica owned by Robert Campos (the person to whom Vado made payments for use of the car) committed a toll violation at the intersection of Route 31 and I-90. On February 22, 2017 (the day the trial began), Vado sent Bartlett police detective Kyle Ficek the following text message: "Sorry for bothering you? I want to ask what I'm supposed to say when I lied about going to 90. I don't want to fucked up tomorrow. I'm getting more nervous." The route to which Vado testified at trial included travel on I-90.

¶ 92    Vado testified that he had not lied intentionally about not driving on I-90 but said that he was confused and scared when the described the route. After the shooting, he had "a lot of stuff" on his mind and thought that he "was going to be next." Hence, he testified, he was not focusing or thinking about the route. Vado also testified that he had never witnessed a murder before, the murder was a shocking event, and the events of the night were "burned" in his mind.

¶ 93                                    b. Blood Stain in the Pacifica

¶ 94    Vado testified that, after the murder, later in the morning on Sunday, August 10, 2014, defendant left his townhouse in the Pacifica, told Vado that he was going to his uncle's house, and, when defendant returned a few hours later, the Pacifica looked and smelled "clean."

¶ 95    Defendant's acquaintance, Zoran Sarich, testified that, around August 14, 2014, or August 15, 2015, defendant and "one of his working partners"—a "young Hispanic kid," brought a Chrysler Pacifica to the car repair shop where Sarich worked. The exhaust system located underneath the car was "dragging the ground." It was almost closing time, and Sarich merely "rehung" the system for no charge; he never entered the car.

¶ 96    In October 2014, Campos repossessed the Pacifica. According to Campos, Vado's payments had stopped, and, while defendant agreed to make payments, he never did. The Pacifica's engine was broken; thus, the finance company towed the car away.

¶ 97    In April 2015, Vado drew a diagram of the Pacifica and identified a blood stain on the front passenger seat. Vado had taken a photograph of the blood stain at some point, although he was unable to retrieve the photograph. On April 10, 2015, the police recovered the Pacifica from a salvage yard in Indiana. A forensic investigator testified that a blood-like stain was found on the left shoulder area of the front passenger seat on the outside as well as the inside foam of the seat cover. There were also numerous areas of stained discoloration on the carpet in the rear passenger seat area that yielded a positive result to a presumptive blood test. The forensic investigator acknowledged that he did not observe any potential scorch marks from a close-range fired gunshot. There was also no testing for scorch marks or gunshot residue.

¶ 98    An FBI supervising forensic biologist, Jeremy Fletcher, testified that the FBI obtained the victim's DNA sample from four of the victim's baseball hats. Based upon his examination of the

DNA profile from the victim's mother and from the victim's hats, he concluded that the major contributor from the hats was at least 11,000 times more likely to have come from the victim than from an unrelated individual. Regarding the presumptively positive blood stains on the carpet in the rear passenger area, a confirmatory test for the presence of blood was not conducted because "the staining was what we refer to as sparse and composite." However, the stains were swabbed, and DNA testing of the swabbing disclosed a major contributor. Based upon a comparison of the DNA from the victim's hats to the DNA of the major contributor, Fletcher concluded that the victim was the source of the DNA.

¶ 99   Regarding the stain on the foam insert of the front passenger seat, serological testing demonstrated the presence of blood. DNA testing was conducted on the bloodstain, and a single DNA profile was recovered. Fletcher testified that the victim was the source of that DNA. Testing of the stain on the fabric cover of the seat cushion also demonstrated the presence of blood. DNA testing demonstrated a major contributor. Again, based upon a comparison of the DNA from the victim's hats to the DNA of the major contributor, Fletcher concluded that the victim was the source of the DNA.

¶ 100   Vents from the center console of the Pacifica tested presumptively positive for blood, but no DNA was recovered. Other items in the Pacifica were examined, but no blood was identified.

¶ 101                    c. Search for the Victim's Body

¶ 102   During the drive with investigators on April 9, 2015, Vado identified the location of the dumpster in the parking lot of the apartment complex at 1415 Todd Farm Drive in Elgin where he said the victim's body was discarded. Vado told the detectives that his DNA might be on the dumpster's lid because he touched it. Police searched the forested area behind the apartment complex but recovered nothing. The evidence established that Groot Recycle Waste (Groot)

collected garbage from the apartment complex's dumpster on Monday, August 11, 2014, at 9:56 a.m. A Groot general manager testified regarding the process by which the garbage truck collects the garbage from the dumpster and transports it to the transfer station in West Chicago. Videos depicting the garbage collection and transfer processes were played for the jury. From the West Chicago transfer station, some garbage was transferred to the Orchard Hills landfill in Davis Junction, but most garbage at that time was transferred to the Lee County landfill in Dixon. As part of the investigation, law enforcement contacted both landfills in April 2015.

¶ 103   Advanced Disposal Services operated the Orchard Hills landfill. Spencer Ervin, the Advanced Disposal Services operations manager, testified that he utilizes a daily plan for the location of garbage disposal in the landfill but records of the plan are not maintained. Ervin testified that he could have given an approximate location within feet of where a particular load was disposed. Nevertheless, excavation would have taken "at least a month," would have cost "millions and millions of dollars," and would have raised environmental concerns. The Orchard Hills landfill was not excavated.

¶ 104   The operations manager for the Lee County landfill, Kenneth Scott, testified that the landfill maintains records of the GPS coordinates for the daily "tipping locations" of waste disposal. From these records, the "tipping point" of the August 11, 2014, disposal was excavated on September 9, 2015, and September 10, 2015. At that point, there was a heavy thunderstorm, and the excavation was discontinued. Approximately one-third of the relevant area had been searched; no body was recovered.

¶ 105                              d. Location of the Buried Gun

¶ 106   During the drive with investigators on April 9, 2015, Vado also identified the location in defendant's backyard where defendant had buried (then unburied) the murder weapon. Detective

Ficek testified that he "dug down" in the spot and found a "bowl-shaped depression" in the earth where the soil was loose and the roots were severed. A videotape of the digging was played for the jury. Detective Ficek acknowledged that his digging occurred at night, that he was unaware of the weather conditions the preceding month or the location of the rain gutters, and that no forensic examination was undertaken to determine the length of time the depression had been there.

¶ 107                    e. Communications Between Vado and Defendant

¶ 108   Numerous text messages and recorded phone calls between Vado and defendant from the months following April 2015 were introduced into evidence, and the recordings were played for the jury. Vado acknowledged that the detectives with whom he was cooperating suggested the content of the text messages. Detective Ficek testified that he instructed Vado to fabricate stories about being arrested for battery and a driving offense. In the text messages, Vado referred to the Bartlett police, represented that there was another warrant for his arrest, and later stated that he had to meet with the Bartlett police. In a series of text messages on May 19, 2015, defendant asked Vado whether the police had spoken to him and specified, "Nothing on package, right?" Vado responded: "I don't heard nothing about that we gucci."

¶ 109   In a series of text messages on June 5, 2015, Vado wrote: "Wtf g u give me in fucking trouble me with the fuking check why u ignoring my calls ok fucked I given your name." Defendant wrote: "I ALSO DONT THINK BRO THAT U SAYING MY NAME TO ANYONE IN COURT OR TO ANY COPS THAT I AM RESPONSIBLE FOR ANYTHING ILLEGAL IS A GOOD IDEA FOR U!!! (u know what Im saying bud)."

¶ 110   In a July 2, 2015, text-message exchange, Vado texted defendant: "Yoo what's up G is sebastion I just got out from jail I will call you in a little bit I hope you answer u phone is I'm scared whe I get arrested then check my name and the cop's told u know Detective from Algonquin

and barttlen are looking for me for missing person fuck g wtf u want me to say!" Defendant responded: "I believe we have already told anyone asking al we knew… I'm tired of this shit!!!! U don't know anything more than I do…. Whats to be scared for…." Vado replied: "Yeah u probably not scared cuz not here g but I'm scared about FL the fuking package u did in my car I'm going to change my number fuck those cop's from barttlen I not telling shit about that fuking guy I forgot he's fucking name!" On July 23, 2015, Vado wrote: "We are fucking lucky about those motherfucker never find the package! Jajaj I know now why u watch so many movies Mr Versace I miss you uncle g." Defendant responded: "Love u 2….not sure what u mean about a package ! But I understand…".

¶ 111    In a series of text messages on August 5, 2015, and August 6, 2015, Vado wrote in reference to the Bartlett police: "I have to meet these guys Monday or they going for me. I don't remember shit u have to fucking help me." Vado further wrote: "I don't kill no one tell me what I have to say those guys…" Defendant responded: "There not blaming anything on u dummy!!! There just trying to see if any of us heard from him thats all…I know I haven't n I doubt you have..." Defendant suggested that Vado start "packing a bag n hop on a flight I book for u to come visit?" In an August 8, 2015, text-message, defendant wrote: "Pack ur shit then!! Head out ASAP… Drive carefully." In an August 10, 2015, recorded phone call, Vado and defendant discussed Vado's move to Colorado. Defendant told Vado several times not to tell "fucking Jen or nobody" that Vado was going to Colorado. In an August 18, 2015, recorded phone call, Vado and defendant again discussed Vado's move to Colorado. In a series of text messages on August 19, 2015, and August 20, 2015, Vado and defendant discussed arrangements for the move to Colorado. The last text message from defendant on August 20, 2015, read, "Let's go."

¶ 112                             10. Investigation in Colorado

¶ 113   Defendant was taken into custody in Colorado on August 20, 2015. Detective Ficek and City of Elgin police officer Christopher Hughes conducted custodial interviews of defendant on that date; videos of the interviews were played for the jury. Defendant denied knowledge of the victim's disappearance or murder. Defendant stated that he was home on August 9, 2014, through August 10, 2014, and that Vado had his phone during this time.

¶ 114   On August 20, 2015, and August 21, 2015, the police executed search warrants of defendant's home and car in Colorado. Several guns, receipts and transfer documents for guns, and firearms manuals were recovered. Neither a 9-millimeter Ruger handgun nor any paperwork for a 9-millimeter Ruger handgun were found. The police also recovered a calendar from defendant's car. The calendar included entries on April 20, 2015, and May 18, 2015, regarding Vado's court dates.

¶ 115   Kane County detective Steven Bruening, an expert in cell phone and computer analysis—specifically Cellebrite analysis—testified regarding the data extracted and analyzed from Vado's phone and defendant's cell phone, including the series of text messages discussed above.[1] Many of the text messages on defendant's phone had been deleted but were able to be recovered. However, between August 3, 2014, and September 19, 2014, there was no saved call log or text messaging data on defendant's cell phone. The cell phone had been repaired right after this time period, and the data could have been lost.

¶ 116   The data extracted from defendant's cell phone showed the following Google searches: "keith crawford," "keith crawford bartlett," "keith crawford Illinois," "where are dumpsters

---

[1] The text messages were introduced in their entirety for completeness. We recount only relevant portions here, as set forth in Detective Bruening's testimony and in the parties' briefs.

emptied at," "pictures of a crash site where dumpsters empty," "groot garbage dump," "groot garbage," and "disassemble P 95 Ruger 9 mm." There were no dates or times associated with the internet searches because they were either deleted from the browsing history or searched in a private setting on the browser. The bracket of time when the searches were done was between January 2014 and when defendant's cell phone was seized on August 20, 2015. Bruening acknowledged that that defendant's cell phone was not locked with a passcode.

¶ 117   Defendant was arrested and extradited to Illinois.

¶ 118                              B. Jury Instructions

¶ 119   At the jury instruction conference, defendant proposed several nonpattern and modified pattern jury instructions. We discuss those relevant to this appeal.

¶ 120                              1. State's Burden of Proof

¶ 121   Defendant requested the following nonpattern instruction regarding the State's burden of proof:

> "In a case involving first degree murder or concealment of a homicidal death, the State has the burden of proving the fact of death and that the death was produced by criminal agency. The State has the burden of proving the fact of death and that the death was produced by criminal agency beyond a reasonable doubt. This burden never shifts to the defendant and the defendant is not required to prove that the alleged victim is alive or that the death was not produced by criminal agency."

¶ 122   Defendant also proposed a modified version of Illinois Pattern Jury Instructions, Criminal, No. 7.02 (approved Jan. 30, 2015) ("Issues In First Degree Murder (When Second Degree Murder Is Not Also An Issue")) (hereinafter IPI Criminal No. 7.02), as follows:

"To sustain the charge of first degree murder, the State must prove the following propositions:

*First Proposition*: That Keith Crawford is dead and that he died through criminal agency.

*Second Proposition*: That the defendant performed the acts which caused the death of Keith Crawford; and

*Third Proposition*: That when the defendant did so, he intended to kill or do great bodily harm to Keith Crawford, or he knew that his acts would cause death to Keith Crawford, or he knew that his acts created a strong probability of death or great bodily harm to Keith Crawford.

If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty.

If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty."

¶ 123    The State objected to these instructions. The trial court refused the instructions on grounds that IPI Criminal No. 7.02 properly addressed the law regarding the State's burden of proof for first-degree murder and instructed the jury in accordance with IPI Criminal No. 7.02 that:

"To sustain the charge of first degree murder, the State must prove the following propositions:

*First Proposition*: That the defendant, or one for whose conduct he is legally responsible, performed the acts which caused the death of Keith Crawford; and

*Second Proposition*: That when the defendant, or one for whose conduct he is legally responsible, did so, he intended to kill or do great bodily harm to Keith Crawford;

If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty.

If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty."

¶ 124                                   2. Accomplice-Witness Testimony

¶ 125   Defendant requested a modified version of the pattern accomplice-witness instruction (Illinois Pattern Jury Instructions, Criminal, No. 3.17 (approved Oct. 17, 2014) ("Testimony Of An Accomplice") (hereinafter IPI Criminal No. 3.17)), as follows:

"When a witness says he was involved in the commission of a crime with the defendant, the testimony of that witness is subject to suspicion and should be considered by you with caution. It should be carefully examined in light of the other evidence in the case. If a witness is hoping for a reward from the prosecution, the witness's testimony should not be accepted unless it carries within it an absolute conviction of truth."

¶ 126   The State objected. The trial court refused the instruction on grounds that IPI Criminal No. 3.17 properly states the law on accomplice-witness testimony and instructed the jury in accordance with IPI Criminal No. 3.17 that: "When a witness says he was involved in the commission of a crime with the defendant, the testimony of that witness is subject to suspicion and should be considered by you with caution. It should be carefully examined in light of the other evidence in the case."

¶ 127                    3. Statements of a Person Other Than Defendant

¶ 128   Defendant sought the following nonpattern instruction to advise the jury that it could consider Chance Cager's statements against penal interest as substantive evidence:

> "You have before you evidence that a person other than the defendant made statements relating to the offenses charged in the indictment. It is for you to determine whether that person made the statements, and, if so, what weight should be given to the statements. In determining the weight to be given to a statement, you should consider all of the circumstances under which it was made."

¶ 129   Defendant asserted that the proposed instruction was an "analogy" to Illinois Pattern Jury Instructions, Criminal, No. 3.06-3.07 (approved Oct. 17, 2014) ("Statements By Defendant") (hereinafter IPI Criminal No. 3.06-3.07), which provides:

> "You have before you evidence that [(the) (a)] defendant made [a] statement[s] relating to the offense[s] charged in the [(indictment) (information) (complaint)]. It is for you to determine [whether the defendant made the statement[s], and, if so,] what weight should be given to the statement[s]. In determining the weight to be given to a statement, you should consider all of the circumstances under which it was made."

¶ 130   Defendant argued that the purpose of IPI Criminal No. 3.06-3.07 is "to help the prosecution to let the jury know that they can consider a defendant's statements even though you might think a defendant's statements were hearsay otherwise." Thus, defendant argued, the jury likewise should be instructed that it could consider Cager's hearsay statements. The State objected, arguing the dearth of any supporting case law and the express limitation in IPI Criminal No. 3.06-3.07 to a "defendant's" statements. The trial court refused the instruction on grounds that it had no bearing

on defendant's ability to argue his theory of the case and was unnecessary to the jury's understanding of the issues.

¶ 131                                    C. The Jury's Verdict

¶ 132   Following closing arguments, on March 7, 2017, the jury found defendant guilty of first-degree murder and concealment of a homicidal death. The jury also found that defendant personally discharged the firearm that proximately caused the death of another person during the commission of first-degree murder. However, the jury found defendant not guilty of armed robbery.

¶ 133                                    D. Posttrial Proceedings

¶ 134   Defendant filed a motion for a new trial and/or for judgment notwithstanding the verdict. He argued, *inter alia*, that he was not proven guilty beyond a reasonable doubt, that the trial court erroneously denied his proposed jury instructions, and that the trial court erroneously allowed the admission of other-crimes evidence against him. Following argument, the trial court denied the motion. A sentencing hearing proceeded on July 13, 2017. The trial court sentenced defendant to a 45-year prison term for first-degree murder and a consecutive five-year prison term for concealment of a homicidal death. Defendant filed a motion to reconsider the sentence, which, following argument, the trial court denied on August 4, 2017. Defendant timely appealed.

¶ 135   Subsequently, however, on December 18, 2017, defendant filed a motion to stay his direct appeal pending the potential filing of a petition for collateral relief based upon supplemental discovery from the State. The supplemental discovery was a November 13, 2017, letter from Vado to the prosecutor. In the letter, Vado sought assistance in preventing his deportation, and, according to defendant, claimed innocence in the underlying case. We granted defendant's motion to stay

over the State's objection and ordered periodic status reports. Defendant filed periodic status reports in this court as he pursued the collateral relief discussed below.

¶ 136                                   E. Section 2-1401 Petition

¶ 137   On November 13, 2018, defendant filed a petition for relief from judgment pursuant to section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2018)). At that point, the State had supplemented its discovery with additional letters that Vado sent to the prosecutors and the trial court judge. Defendant alleged that the letters constituted newly discovered evidence of defendant's innocence and warranted a new trial. In the petition, defendant represented that Vado had testified to an agreement that he would not be deported following his testimony. Defendant alleged that, in the letters, Vado sought assistance in preventing his deportation and asserted his innocence in the underlying matter. Defendant alleged that Vado's assertion of innocence contradicted his plea of guilty to concealment of a homicidal death. Had Vado testified at trial that he was innocent of the crime to which he pled guilty, defendant asserted, "it is probable that the jury would have concluded that his testimony was not truthful and that [defendant] should be acquitted." According to defendant, without Vado's testimony, there was insufficient evidence to convict defendant of first-degree murder.

¶ 138   The State moved to dismiss the 2-1401 petition and/or for summary judgment on the petition. Following briefing, on February 28, 2019, the trial court granted the requests for both dismissal and summary judgment. In dismissing the petition without an evidentiary hearing, the trial court found the petition "rife with conclusory allegations," including the allegation that there was insufficient evidence to convict defendant without Vado's testimony. The trial court further found defendant's representation that Vado had testified at trial about an agreement with the

prosecution that he would not be deported to be not only conclusory, but also "false as shown by the transcript of Vado's testimony."

¶ 139   Moreover, the trial court found, while defendant alleged that Vado's credibility hinged on his claim to have been present during the murder and concealment, the allegation was "not a well-pleaded fact as it ignores the extensive corroboration presented of Vado's testimony at the trial." The trial court rejected the argument that Vado's letters contradicted his guilty plea and trial testimony. Rather, "the jury was apprised of [Vado's] agreement and his plea and heard his explanation under direct and cross-examination." Although the trial court dismissed the 2-1401 petition, it also held that the State was entitled to summary judgment on the petition based upon its finding that Vado's letters did not "contradict let alone recant his trial testimony."

¶ 140   Defendant timely appealed. We granted defendant's motion to consolidate the appeal from the denial of the 2-1401 petition with the appeal from his pending direct appeal.

¶ 141                                          II. ANALYSIS

¶ 142   Defendant challenges the sufficiency of the evidence to support his first-degree murder conviction, the trial court's refusal to instruct the jury in accordance with his proposed modified and nonpattern jury instructions, and the trial court's admission of prior-bad-acts evidence against him. Defendant also argues that he was entitled to an evidentiary hearing on the 2-1401 petition to vacate his conviction. We address each argument in turn.

¶ 143   Preliminarily, however, we note that the record citations provided throughout defendant's opening and reply briefs do not correspond to the page numbers of the report of proceedings, in violation of Illinois Supreme Court Rule 341(h)(6) and (7). See Ill. S. Ct. R. 341(h)(6), (7) (eff. Oct. 1, 2020) (an appellant's brief must contain a statement of facts and argument section with appropriate citation to the record). The rules of procedure regarding appellate briefs are not mere

suggestions, and when procedural violations interfere with our review of the issues on appeal, it is within our discretion to strike the brief and dismiss the appeal for failure to comply with the rules. *Parkway Bank & Trust Co. v. Korzen*, 2013 IL App (1st) 130380, ¶ 10. We nevertheless determine that the deficiencies ultimately do not preclude our review of defendant's arguments but caution counsel regarding procedural compliance. We also note that in his briefs, defendant cites two unpublished decisions entered prior to January 1, 2021. He does so in violation of Illinois Supreme Court Rule 23 (eff. Jan. 1, 2021), without acknowledgement of the rule, and without recognition of the unpublished nature of the case in his citation format. We elect not to consider these cases.

¶ 144                              A. Sufficiency of the Evidence

¶ 145   Defendant argues that the State failed to prove him guilty beyond a reasonable doubt of first-degree murder. He contends that Vado's testimony was insufficient evidence to sustain his conviction; evidence of Chance Cager's involvement established a reasonable doubt of defendant's guilt; and the State failed to provide sufficient proof of the victim's death. The State responds that it was the jury's role to assess the credibility of Vado's testimony and that discrepancies in the testimony affected only its weight; defendant's theory that Cager was involved did not affect the sufficiency of the evidence against defendant; and production of the victim's body was not required to prove the victim's death in light of the evidence presented.

¶ 146   The State has the burden of proving beyond a reasonable doubt each element of an offense. *People v. Gray*, 2017 IL 120958, ¶ 35 (citing *Jackson v. Virginia*, 443 U.S. 307, 315-16 (1979)). A reviewing court faced with a challenge to the sufficiency of the evidence must determine "whether, [after] viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Internal quotation marks omitted.) *Id.* The reviewing court's role is not to retry the defendant. *Id.* Rather,

it is the trier of fact's responsibility to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts. *Id.* Thus, a reviewing court will not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of the witnesses. *Id.* A criminal conviction will not be reversed unless the evidence is "so unreasonable, improbable, or unsatisfactory" that it leaves reasonable doubt of the defendant's guilt. *Id.*

¶ 147　Here, considering the evidence in the light most favorable to the prosecution, the record demonstrates sufficient evidence from which a rational trier of fact could have found the essential elements of first-degree murder beyond a reasonable doubt. A person commits first-degree murder if, in performing the acts that cause a death, he or she intends to kill or do great bodily harm to the victim or another individual, knows that the acts will cause the victim's or another's death, or knows the acts create a strong probability of death or great bodily harm to the victim or another. 720 ILCS 5/9-1(a)(1), (a)(2) (West 2014); *People v. Joiner*, 2018 IL App (1st) 150343, ¶ 59.

¶ 148　Vado testified in detail regarding the events that transpired the night before and the night of the murder. On Friday, August 8, 2014, the night before the murder, defendant, the victim, Vado, and others were at defendant's townhouse in Algonquin. Vado overheard defendant and the victim arguing about money and drugs. In response to defendant's request for drugs, the victim replied: "I'm not gonna give you shit. You owe me money." After the drug transaction involving Balleno, defendant was mad and told the victim that he was using defendant's house and "people" to "sell shit" and make money. Expert testimony regarding the cell-site activation analysis of phone records confirmed incoming and outgoing calls between defendant's phone and the victim's phone that evening and into the morning of Saturday, August 9, 2014, and that the victim's phone was in the area of defendant's townhouse during the time period.

¶ 149    Vado further testified that the next evening and into the early morning hours of Sunday, August 10, 2014, defendant was angry that the victim attended the Lathrop Lane party and was "screaming and yelling" at someone on the phone. Defendant subsequently told Vado that he spoke to the victim and asked Vado to drive him to the party to pick up the victim, go to Quagliano's house, pay the victim, and obtain more drugs. Vado drove defendant there in the Pacifica. After defendant's unanswered calls, the "drunk" victim materialized and agreed to accompany them. At this point, defendant jumped out of the front passenger seat and moved to the back seat. The victim sat in the front passenger seat. When Vado was driving on Route 31 toward Quagliano's house, he heard a loud gunshot inside the car, and the victim's body fell onto Vado's shoulder. Vado testified that defendant shot the victim with a nine-millimeter gun, that Vado could see blood in the back of the victim's head, and that the victim was dead.

¶ 150    Defendant then "put the gun on" Vado, told Vado to "drive safe" or he was going to "come after" Vado's wife and children, and took Vado's cell phone. While Vado continued to drive, defendant wrapped the victim's head in a sheet of clear plastic to stop the bleeding. When they arrived at Quagliano's house, defendant and Quagliano wrapped the victim's body in carpet and returned the body to the Pacifica. Defendant then forced Vado to drive the car to find a place to dispose of the victim's body. Eventually, they drove to the apartment complex where defendant disposed of the body in the parking lot dumpster. After disposing of the body, defendant attempted to clean blood from the Pacifica, burned the victim's wallet and identification, and then buried and unburied the murder weapon.

¶ 151    Expert testimony regarding the cell-site activation analysis of phone records confirmed incoming and outgoing communications between defendant's phone and the victim's phone and the use of both phones, as well as Vado's phone, in the Lathrop Lane area in the early morning

hours of Sunday, August 10, 2014. The last outgoing communication from the victim's phone was at 2:19 a.m. The victim's phone and defendant's phone were south of the Lathrop Lane area at this time—indicative of "simultaneous travel." The victim's phone was near the intersection of Route 25 and I-90 at 2:41 a.m. but then appeared to "stop." In the ensuing hours, both defendant's phone and the victim's phone were near Quagliano's house. By 5:39 a.m., both defendant's phone and Vado's phone were back in the vicinity of defendant's townhouse. There was testimony from Nord, Quagliano's acquaintance, that Quagliano called him in the early morning hours of August 10, 2014, and told him that defendant "showed up with a car and some bullshit" and would not leave.

¶ 152   Ultimately, a blood stain was found on the foam insert of the front passenger seat of the Pacifica. DNA testing reflected that the victim was the source of the blood. During the investigation, defendant moved to Colorado. Defendant sent Vado several threatening text messages urging him not to mention defendant's name to anyone. The data extracted from defendant's cell phone showed internet searches about the victim, the "Groot" garbage dumpster, the location of dumpster disposal, and the disassembling of a "P 95 Ruger 9 mm."

¶ 153   Defendant first contends that Vado's testimony was insufficient evidence to sustain his conviction. Initially, defendant characterizes Vado as an "immunized accomplice." However, the record demonstrates that Vado was not granted immunity from prosecution. Rather, he testified that he pled guilty to concealment of a homicidal death and, pursuant to his agreement with the prosecution, he would receive a six-month jail sentence (and serve three months) if he cooperated in defendant's case and testified truthfully. Moreover, the jury heard evidence of Vado's involvement in concealment of a homicidal death and his ultimate plea agreement, which it presumably considered in assessing his credibility.

¶ 154   Regardless, defendant argues that Vado's testimony failed "to carry with it an absolute conviction of truth." In support of this standard, defendant cites *People v. Newell*, 103 Ill. 2d 465, 469-70 (1984) (citing *People v. Ash*, 102 Ill. 2d 485, 493 (1984)), as well as subsequent appellate court decisions referring to this standard (see, *e.g.*, *People v. Othman*, 2020 IL App (1st) 150823-B, ¶ 41; *People v. Hunt*, 2016 IL App (2d) 140786, ¶ 39)). As we explained in *People v. Winston*, 160 Ill. App. 3d 623, 629 (1987), the " 'absolute conviction' standard used in *Ash* applies in circumstances unlike here, where the accomplice's testimony is uncorroborated." See also *People v. Jones*, 2020 IL App (4th) 190909, ¶¶ 164-65, *petition for leave to appeal denied*, 159 N.E.3d 950 (Nov. 18, 2020) (the "absolute-conviction-of-truth language comes ultimately from a 100-year old case," and "[a]s late as 1998, [our] supreme court was still using that language with reference to accomplice testimony," but "[m]ore recently," our supreme court held that all eyewitness testimony was subject to the same deferential standard of review set forth in *Jackson v. Virginia*, 443 U.S. at 319).

¶ 155   Here, Vado's testimony was substantially corroborated. Expert testimony regarding the cell-site activation analysis of phone records substantiated his timeline of events. DNA testing of the blood stain in the Pacifica reflected that the victim was the source of the blood. Also, the history on defendant's cell phone reflected searches relating to details and events set forth in Vado's account.

¶ 156   Distilled, defendant's argument is that his conviction should be reversed because it was based upon accomplice testimony. He cites a litany of cases where convictions based upon accomplice testimony were reversed, although he concedes that "the facts of each case are obviously unique." However, while an accomplice witness's testimony "has inherent weaknesses and should be accepted with caution and suspicion," an accomplice witness's testimony, "whether

corroborated or uncorroborated, is sufficient to sustain a criminal conviction if it convinces the jury of the defendant's guilt beyond a reasonable doubt." *People v. Tenney*, 205 Ill. 2d 411, 429 (2002).

¶ 157   Defendant argues that Vado was not credible given his involvement in the events, his motive to lie to avoid prosecution and deportation, and his inconsistent testimony regarding the route he drove the night of the murder. He argues that Vado's claimed fear that defendant would harm him or his family was "ludicrous" given his testimony that he had been a police informant in the past and had in fact, in December 2014, reported defendant's possession of drugs and the gun. However, the jury heard extensive evidence regarding Vado's involvement in concealing the homicidal death, his plea agreement, and his understanding that he faced possible deportation. The jury was presented with this evidence along with the substance of Vado's testimony, including his inconsistent denial of any involvement in the victim's disappearance and version of events to police. Additionally, the jury was instructed in accordance with IPI Criminal No. 3.17 that: "When a witness says he was involved in the commission of a crime with the defendant, the testimony of that witness is subject to suspicion and should be considered by you with caution. It should be carefully examined in light of the other evidence in the case." The jury was in the best position to consider witness credibility, resolve inconsistencies, and determine the weight to be afforded testimony. We may not substitute our judgment for that of the jury on questions involving witness credibility. See *Gray*, 2017 IL 120958, ¶ 35.

¶ 158   Defendant also argues that evidence that Chance Cager "killed or kidnapped" the victim established a reasonable doubt of defendant's guilt. According to defendant, the "fact that Cager was apparently the last person to see [the victim] alive is significant circumstantial evidence that Cager was involved in [the victim's] disappearance and/or murder, particularly combined with his

false alibi." See, *e.g.*, *People v. Milka*, 211 Ill. 2d 150, 179-83 (2004); *People v. Lang*, 225 Ill. App. 3d 229, 235 (1992). The evidence, however, including Vado's testimony and the cell-site activation analysis supported the conclusion that defendant and Vado, not Cager, were the last people to see the victim alive. Evidence was introduced that Cager told a witness he drove to the Lathrop Lane party with the victim. But Cager also told a witness that he and the victim sold drugs at the party and that he never saw the victim after they "split up to go and make deals."

¶ 159   Defendant relies extensively on Cager's conflicting accounts of his actions on the night of the victim's disappearance. He retracted his version that he met the victim at a gas station before the party once confronted with the video from the gas station. And the stipulated testimony of his girlfriend contradicted Cager's initial account to the police that he left the Lathrop Lane party at around 3 a.m. to get more beer from his girlfriend's home. However, the jury reasonably could have inferred that his inconsistent accounts of his whereabouts were the result of Cager's intoxication on the night of the party. Defendant also relies upon witness testimony that after months of apparent penury, Cager was flush with cash the day after the victim's disappearance. Defendant contends that this evidence supports an inference that Cager was involved in the victim's disappearance. But the jury reasonably could have inferred that Cager obtained the money by selling drugs at the party.

¶ 160   Defendant points to Cager's suspicious behavior and contends that the forward position of the driver's seat in the victim's mother's car when the car was recovered was consistent with the car being driven by a person shorter than the victim, such as Cager, although he does not provide record citation for the victim's height. Defendant's argument appears to be a request to apply the obsolete "reasonable-hypothesis-of-innocence" standard, *i.e.*, where the trier of fact was required to exclude every reasonable hypothesis of innocence before finding a defendant guilty in wholly

circumstantial evidence cases. See *People v. Pintos*, 133 Ill. 2d 286, 291 (1989) (the reasonable doubt test is applicable in reviewing the sufficiency of the evidence in all criminal cases; "the reasonable hypothesis of innocence standard of review is no longer viable in Illinois"). Here, the record demonstrates sufficient evidence upon which the jury could have rejected the defense's theory regarding Cager's involvement and found defendant guilty of first-degree murder beyond a reasonable doubt.

¶ 161    As a final matter, defendant argues that the State failed to provide sufficient proof of the victim's death. "Proof of an offense requires proof of two concepts: first, that a crime occurred, or the *corpus delicti*, and second, that it was committed by the person charged." *People v. Ehlert*, 211 Ill. 2d 192, 202 (2004). Defendant points out that the victim's body was never recovered. The State, however, is not required to produce the victim's body to prove *corpus delicti*. *Campbell v. People*, 159 Ill. 9, 22-23 (1895); *People v. Avery*, 88 Ill. App. 3d 771, 777 (1980). Here, there was sufficient evidence from which the jury could have found the *corpus delicti*. Vado testified that he was sitting next to the victim when the victim was shot. The victim's body fell onto Vado's shoulder. Vado testified that he could see blood in the back of the victim's head and that the victim was dead. Vado further testified that he saw defendant and Quagliano wrap the victim's body in carpet and return the body to the Pacifica and that defendant subsequently disposed of the body in a dumpster.

¶ 162    Moreover, the cell-site activation analysis showed that the last outgoing communication on the victim's phone was at 2:19 a.m. on August 10, 2014. And there was extensive testimony from the victim's family and friends regarding the victim's disappearance. The victim's mother, with whom the victim lived, testified that the victim left their home at 9 p.m. or 10 p.m., on Saturday evening, August 9, 2014. She never heard from him again. The mother of two of the victim's

children testified that she maintained regular and consistent contact with the victim and that the victim saw the children daily. However, neither she nor the children have had any communication with the victim since the evening of August 9, 2014. The mother of two of the victim's other children testified that she and the victim had daily contact by phone or text message. She has had no communication with the victim since August 9, 2014. The victim's best friend likewise testified that he has neither seen nor heard from the victim since August 9, 2014.

¶ 163  Defendant maintains that the pings from the victim's cell phone "suggested that he was alive until the next day." This argument is unclear because the testimony established that that pinging occurred on August 14, 2014, not the "next day" after the victim's disappearance. In any event, the testimony established that if a cell phone does not ping, it means either that the phone was not turned on or the battery was dead. In other words, the pinging merely showed that the phone had been turned on or had power; it did not show who had the phone, if anyone. As discussed, it was undisputed that the last outgoing communication on the victim's phone was at 2:19 a.m. on August 10, 2014. Any inferences from the pinging were a matter within the province of the jury. See *Gray*, 2017 IL 120958 ¶ 35. Finally, and most significantly, DNA testing of the blood stain in the Pacifica reflected that the victim was the source of the blood. Defendant fails to establish a basis for reversal on this ground. In sum, when considering all of the evidence in the light most favorable to the prosecution, we conclude that a rational trier of fact could have found the essential elements of first-degree murder beyond a reasonable doubt.

¶ 164                              B. Jury Instructions

¶ 165  Defendant argues that the trial court abused its discretion in refusing to give the jury his proposed nonpattern and modified pattern instructions regarding the State's burden of proof, consideration of accomplice-witness testimony, and consideration of the statements of a person

other than defendant as substantive evidence. The State responds that the issued pattern jury instructions accurately stated the relevant law and that, regardless, any error in refusing the instructions was harmless.

¶ 166　The purpose of jury instructions is to provide the jury with the correct legal principles applicable to the evidence so that the jury may apply those principles to the facts and reach a proper conclusion based on the law and the evidence presented. *People v. Hoffman*, 2012 IL App (2d) 110462, ¶ 8. In addressing the adequacy of jury instructions, the reviewing court must consider the jury instructions in their entirety to determine whether they fully and fairly cover the law. *Id.* If the trial court determines that the jury should be instructed on a subject in a criminal case, and the IPI Criminal contains an applicable instruction, then the IPI Criminal instruction "shall be used, unless the court determines that it does not accurately state the law." Ill. S. Ct. R. 451(a) (eff. April 8, 2013); *Hoffman*, 2012 IL App (2d) 110462, ¶ 9.

¶ 167　The parties disagree about the standard of review. Defendant argues that the "issue of whether jury instructions accurately conveyed to the jury the applicable law is reviewed *de novo*." *People v. Parker*, 223 Ill. 2d 494, 501 (2006). The State argues that "[i]n general the trial court's decision to determine the jury instructions to be given is afforded deference and will not be reversed absent an abuse of discretion." *People v. Lovejoy*, 235 Ill. 2d 97, 150 (2009). The parties are both right. "In general, whether the trial court erred in refusing a particular jury instruction is reviewed under an abuse of discretion standard. [Citation omitted.] Whether a particular jury instruction accurately conveyed to the jury the law applicable to the case, however, is an issue that we review *de novo*. [Citation omitted.]" See *People v. Nere*, 2018 IL 122566, ¶ 29.

¶ 168　Defendant's challenge to the trial court's refusal of his proposed accomplice-witness instruction amounts to an argument that the instruction did not accurately convey the applicable

law. We review this ruling *de novo*. See *id.* However, the balance of defendant's challenge to the trial court's refusal of his proposed instructions amounts to an argument that the instructions were warranted given the evidence at trial. We review these rulings for an abuse of discretion. See *id.* The refusal of a non-IPI instruction is an abuse of discretion where there is no applicable IPI instruction and the jury was left to deliberate without proper instruction. *Hoffman*, 2012 IL App (2d) 110462, ¶ 10. Conversely, refusal of a non-IPI instruction is not an abuse of discretion where there is an applicable IPI instruction or the essence of the refused instruction is covered by other given instructions. *Id.* We turn to defendant's challenges to the trial court's refusal of his proposed jury instructions.

¶ 169                                     1. Burden of Proof

¶ 170    Defendant sought a nonpattern instruction that the State had the burden to prove that the victim was dead and that his death was caused by criminal agency as well as a corresponding modified version of IPI Criminal No. 7.02. The trial court refused the instructions on grounds that the IPI first-degree murder instruction properly addressed the law and instructed the jury in accordance with IPI Criminal No. 7.02, *inter alia*, that the State had the burden to prove beyond a reasonable doubt that "the defendant, or one for whose conduct he is legally responsible, performed the acts which caused the death of Keith Crawford" and that "when the defendant, or one for whose conduct he is legally responsible, did so, he intended to kill or do great bodily harm to Keith Crawford." Defendant challenges this ruling on grounds that his proposed modification was critical here because the State did not produce the victim's body. Defendant's argument lacks merit.

¶ 171    In a murder prosecution, the *corpus delicti* consists of "the fact of death" and "the fact that death was produced by a criminal agency." *Ehlert*, 211 Ill. 2d at 202. According to defendant, IPI

Criminal No. 7.02 conflates the two elements of the *corpus delicti* by instructing the jury that it has to find beyond a reasonable doubt that defendant performed the acts that caused the victim's death, but failing to instruct the jury that it has to find beyond a reasonable doubt that the victim is in fact dead. Defendant contends that, while this conflation may be immaterial in most cases, here, the consequent confusion from use of the pattern instruction was significant because "there was a substantial doubt about whether Crawford was dead, when he died, and whether he died by criminal agency."

¶ 172   Defendant's argument is illogical. It is manifest that the jury could not have found that the State proved that defendant performed the acts which caused the victim's death unless the jury determined that the victim was in fact dead. Moreover, the jury could not have found that the State proved that when defendant did so, he intended to kill or do great bodily harm to the victim unless the jury determined that the victim's death was caused by criminal agency.

¶ 173   Defendant nonetheless analogizes his case to *People v. Ehlert*, 274 Ill. App. 3d 1026, 1038 (1995), where the appellate court reversed the defendant's conviction for murdering her newborn infant and stated that on remand, the trial court was required to instruct the jury that the State must prove beyond a reasonable doubt that the child was born alive. On remand, the defendant was again convicted of first-degree murder, but the appellate court reversed on insufficiency-of-the-evidence grounds. *People v. Ehlert*, 335 Ill. App. 3d 467 (2002). In affirming the reversal of the defendant's second conviction, our supreme court agreed that the evidence was insufficient to prove that the child was born alive or died from unnatural causes. *Ehlert*, 211 Ill. 2d at 206-10. Considering the two essential elements of the *corpus delicti* for murder, the court explained that "where the State alleges that the defendant has killed her newborn, the State must [also] prove that the infant was born alive." *Id.* at 203.

¶ 174 The principle that the State must prove that a newborn infant was born alive has no application here. It was undisputed that the victim was alive prior to the shooting. The instruction to which defendant refers is particular to a prosecution for murder of a newborn infant. See IPI, Criminal, No. 7.01 (approved Jan. 30, 2015), Committee Note (citing *Ehlert*, 335 Ill. App. 3d 467, and setting forth the proposed instruction that to sustain the charge of first degree murder, the State must prove, *inter alia*, that "the baby, Jane Doe was born alive" and that "after the live birth the defendant performed the acts which caused the death of the baby, Jane Doe"). Thus, we cannot say that the trial court's refusal of defendant's proposed nonpattern and modified pattern instructions regarding the State's burden of proof was an abuse of discretion.

¶ 175                          2. Accomplice-Witness Instruction

¶ 176 The jury was instructed in accordance with IPI Criminal No. 3.17 that: "When a witness says he was involved in the commission of a crime with the defendant, the testimony of that witness is subject to suspicion and should be considered by you with caution. It should be carefully examined in light of the other evidence in the case." However, according to defendant, IPI Criminal No. 3.17 failed to adequately convey the principle that where an accomplice testifies in the hope of leniency from the prosecution, the testimony must have an absolute conviction of truth. Thus, defendant's proposed instruction sought the addition of a third sentence to incorporate the following principle: "If a witness is hoping for a reward from the prosecution, the witness's testimony should not be accepted unless it carries with it an absolute conviction of its truth." As discussed *supra*, defendant has not demonstrated the applicability of this standard. Nevertheless, citing *People v. Mostafa*, 5 Ill. App. 3d 158 (1971), defendant contends that there is a conflict in the appellate court regarding whether IPI Criminal No. 3.17 should be modified to include the principle. We disagree.

¶ 177   In *Mostafa*, the First District Appellate Court reversed defendant's murder conviction based upon several trial errors and insufficiency of the evidence. The case against the defendant hinged on the uncorroborated testimony of four accomplices, all of whom were promised some form of leniency by the prosecution in return for their testimony. *Id.* at 169-75. In holding that the evidence did not support the verdict, the appellate court recognized that a reviewing court will not disturb a conviction resting solely on accomplice testimony where the facts and circumstances to which the accomplices testified, "scrutinized by rules governing appraisal of testimonial evidence," were sufficient to prove guilt beyond a reasonable doubt. *Id.* at 175. However, the court noted, "the utmost caution is required of a court or jury when reliance is on accomplice testimony alone, most particularly where the witnesses are self-confessed and discredited criminals and the proof shows that the accused is a respectable and law abiding citizen." *Id.* at 175-76. Accordingly, "[t]his caution is usually accompanied by the admonition that when accomplice witnesses have hopes of reward from the prosecution, their testimony should not be accepted unless it carries with it absolute conviction of its truth." *Id.* at 176. Given the contradictory nature of the accomplice witnesses' testimony, the *Mostafa* court held that their testimony was neither credible nor satisfactory to support the defendant's conviction. *Id.* at 179-80.

¶ 178   Preliminarily, we note that *Mostafa* is distinguishable. Here, defendant sought a jury instruction that "[i]f a witness is hoping for a reward from the prosecution, the witness's testimony should not be accepted unless it carries with it an absolute conviction of its truth." The court in *Mostafa* set forth this principle in the context of its sufficiency-of-the-evidence analysis, not in the context of addressing a proposed jury instruction. *Id.* at 176.

¶ 179   In any event, the precise argument that defendant raises here was raised and rejected by the Second District Appellate Court in *People v. King*, 165 Ill. App. 3d 464 (1988). The defendant in

*King* sought an instruction that "[w]hen an accomplice witness has hopes of a reward from the prosecution, his testimony should not be accepted unless it carries with it the absolute conviction of its truth." *Id.* at 470. The trial court refused the instruction, and the jury was instructed in accordance with IPI Criminal No. 3.17. *Id.* In affirming, we reasoned that "the IPI instruction adequately informs the jury as to its duty regarding the testimony of an accomplice witness." *Id.* We explicitly declined to follow *Mostafa* and noted that "the precedential value of *Mostafa* has been questioned or distinguished in several subsequent appellate court decisions." *Id.* (citing *People v. Jackson*, 145 Ill. App. 3d 626, 644 (1986); *People v. Columbo*, 118 Ill. App. 3d 882, 978 (1983); *People v. Parks*, 34 Ill. App. 3d 180, 184 (1975), *rev'd on other grounds*, 65 Ill. 2d 132 (1976)); see also *People v. Askew*, 273 Ill. App. 3d 798, 809 (1995) (noting the questionable precedential value of *Mostafa*).

¶ 180    Accordingly, contrary to defendant's argument, IPI Criminal No. 3.17 accurately states the law. The trial court, therefore, did not err in refusing defendant's modified version of the instruction, and, in fact, was required to use the applicable IPI criminal instruction. See Ill. S. Ct. R. 451(a) (eff. April 8, 2013); *Hoffman*, 2012 IL App (2d) 110462, ¶¶ 9-10. The purpose of IPI Criminal No. 3.17 is "to warn the jury that the witness might have a strong motivation to provide false testimony for the State in exchange for immunity or some other lenient treatment." *Hunt*, 2016 IL App (2d) 140786, ¶ 52. Here, the record demonstrates that the jury was fully aware that Vado pled guilty to concealment of a homicidal death after entering into an agreement with the State pursuant to which Vado would be sentenced to six months in jail (but only serve three months) if he cooperated in defendant's case and testified truthfully. The jury was, in turn, instructed in accordance with IPI Criminal 3.17 that Vado's testimony was "subject to suspicion," should be considered "with caution," and "should be carefully examined in light of the other

evidence in the case." In sum, defendant presents no basis upon which to conclude that the trial court's refusal of defendant's proposed modified instruction on accomplice-witness testimony was erroneous.

¶ 181                    3. Statements of a Person Other Than Defendant

¶ 182   Defendant sought a nonpattern instruction that would have told the jury that it could consider Chance Cager's statements against penal interest as substantive evidence. Namely, defendant proposed an instruction to the jury that "[y]ou have before you evidence that *a person other than the defendant* made statements relating to the offenses charged in the indictment;" that "[i]t is for you to determine whether that person made the statements, and, if so, what weight should be given to the statements;" and that "[i]n determining the weight to be given to a statement, you should consider all of the circumstances under which it was made." (Emphasis added.) The trial court refused the instruction on grounds that it had no bearing on defendant's ability to argue his theory of the case and was unnecessary to the jury's understanding of the issues. This ruling was not an abuse of discretion.

¶ 183   Defendant's proposed nonpattern instruction otherwise mirrors IPI Criminal No. 3.06-3.07, titled "Statements By Defendant," but substituted "a person other than the defendant" for "defendant." Defendant cites no case law to support his assertion that IPI Criminal No. 3.06-3.07 should be applied to "a person other than the defendant." Rather, he "analogizes" the proposed instruction to IPI Criminal No. 3.06-3.07 and argues that several pattern jury instructions inform the jury "that out of court statements, which jurors without legal knowledge might normally discount as hearsay, are in fact relevant evidence and may be considered." See, *e.g.*, Illinois Pattern Jury Instructions, Criminal, No. 3.11 (approved Oct. 17, 2014) ("Prior Inconsistent Statements");

No. 11.66 (approved July 18, 2014) ("Statements Admitted Under Section 115-10 Of The Code Of Criminal Procedure").

¶ 184　According to defendant, the jury should have been instructed that it could consider the hearsay statements against penal interest of Chance Cager—"a person other than the defendant"— as substantive evidence just as it could if such statements had been made by a defendant. Indeed, defendant argues, the jury was given IPI Criminal No. 3.06-3.07 to guide its consideration of the statements defendant made to police while in custody in Colorado. Thus, according to defendant, "[w]here the jury had to decide, among other issues, whether [defendant] or Chance Cager was responsible for [the victim's] disappearance and/or death, it was obviously unfair to instruct the jury to consider [defendant's] statements but not Cager's."

¶ 185　Defendant misunderstands the purpose of IPI Criminal No. 3.06-3.07. The instruction is a "special cautionary instruction" warranted by the introduction of a defendant's self-incriminating statements. *People v. James*, 2017 IL App (1st) 143391, ¶ 131. IPI Criminal No. 3.06-3.07 instructs the jury to consider whether the defendant's statements were credible, given the circumstances in which they were elicited. *Id.* Accordingly, the instruction "prevents the jury from simply assuming that the defendant must be guilty because he (ostensibly) admitted his guilt"—an inference "all too easy for a jury to make." *Id.*

¶ 186　Cager was not a defendant. The cautionary instruction has no meaningful application to his statements. Defendant's substitution of "a person other than the defendant" for "defendant" in his proposed nonpattern instruction would have essentially transformed the shield of IPI Criminal No. 3.06-3.07 into a sword to advance his theory that Cager was responsible for the crime. But, as the trial court found, the proposed instruction had no bearing on defendant's ability to argue his theory of the case and was unnecessary to the jury's understanding of the issues. The jury heard evidence

regarding Cager's actions and statements made to acquaintances and the police, and defense counsel argued extensively in closing argument that this evidence established a reasonable doubt of defendant's guilt. The jury was free to consider the evidence in its deliberations and was instructed in accordance with IPI, Criminal, No. 1.01 (approved July 18, 2014) that: "It is your duty to determine the facts and to determine them only from the evidence in this case. You are to apply the law to the facts and in this way decide the case." Accordingly, we cannot say that the trial court abused its discretion in refusing defendant's proposed nonpattern instruction.

¶ 187                    C. Prior-Bad-Acts Evidence

¶ 188   Defendant contends that the trial court abused its discretion in admitting two instances of prior-bad-acts evidence. Namely, the trial court granted the State's motion *in limine* to admit evidence regarding defendant's 2011 conviction for attempted reckless discharge of a firearm and evidence regarding the 2014 incident in which defendant held a gun to Garrett Meyer's head for the limited purpose of what Vado believed and what Vado "would be afraid of." The trial court found the evidence not relevant to "anything but that." Specifically, the trial court reasoned, the evidence was not relevant to whether defendant previously fired a gun or whether it was more likely that he used a gun on someone else—both of which would amount to improper propensity arguments.

¶ 189   The evidence was introduced at trial initially through Vado's testimony that he was afraid of defendant because defendant carried a nine-millimeter handgun every day and told Vado that he had "shot at a guy" in 2011 and "did time for it." Moreover, Vado testified, in the beginning of August 2014, Vado saw defendant put a gun to Garrett Meyer's face.

¶ 190   In addition to Vado's testimony, a certified copy of defendant's 2011 conviction for attempted reckless discharge of a firearm was admitted into evidence, and two Roselle police

officers testified regarding the underlying investigation. The testimony included that, on April 6, 2010, at 1:52 a.m., there was a report of a suspicious vehicle and gunshots fired in an alley behind a commercial and residential building. Defendant was questioned, and he admitted to discharging the gun accidentally and not in the direction of people or buildings. Regarding the August 2014 incident, Meyer testified that defendant invited him to an after-hours party but when Meyer arrived and knocked on defendant's garage door, defendant put a gun to Meyer's head, ordered him to his knees, and asked him to identify himself. Once defendant knew Meyer's identity, defendant withdrew the gun.

¶ 191   Upon the introduction of Vado's testimony and again when Roselle police officers and Meyer testified, the trial court instructed the jury that the evidence could be considered only for the limited purpose of showing the reason for Vado's alleged fear of defendant. The jury received a written limiting instruction as well at the close of evidence.

¶ 192   Citing *People v. Thingvold*, 145 Ill. 2d 441 (1991), defendant contends that the prior-bad-acts evidence was improperly admitted to bolster Vado's credibility and that any probative value of the evidence was outweighed by its prejudicial effect. The State responds that the trial court properly allowed the jury to consider this evidence for the limited purpose of explaining Vado's alleged fear of defendant and that, regardless, any error in the admission of this evidence was harmless.

¶ 193   "Evidence of other crimes is admissible if it is relevant for any purpose other than to show the defendant's propensity to commit crime." *People v. Pikes*, 2013 IL 115171, ¶ 11; see Ill. R. Evid. 404(b) (eff. Jan. 1, 2011) (Evidence of other crimes, wrongs, or acts "may also be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."). However, even where relevant, the evidence should

not be admitted if its prejudicial effect substantially outweighs its probative value. *Pikes*, 2013 IL 115171, ¶ 11. The admissibility of other-crimes evidence rests within the trial court's discretion, and its decision will not be reversed absent an abuse of discretion. *Id.* ¶ 12. An abuse of discretion occurs when the trial court's ruling is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the view adopted by the trial court. *People v. Arze*, 2016 IL App (1st) 131959, ¶ 86.

¶ 194   Here, we need not determine whether the prior-bad-acts evidence amounted to improper bolstering because our review of the record demonstrates that the prejudicial nature of the evidence substantially outweighed any probative value. The trial court admitted the evidence to show the reason for Vado's alleged fear of defendant. However, Vado testified that he witnessed defendant shoot the victim while the three men drove in Vado's car. Defendant then threatened to "come after" Vado's wife and children if Vado did not "drive safe." Vado further testified that he witnessed defendant wrap the victim's body in carpet and discard it in a dumpster. There was also extensive testimony and electronic evidence about defendant's threatening communications toward Vado in the ensuing months, including a text message where he reminded Vado that he knew Vado's girlfriend's address. Thus, there was an abundance of evidence from which to establish Vado's alleged fear without consideration of the prior-bad-acts evidence.

¶ 195   Moreover, introduction of the prior-bad-acts evidence was not isolated. Evidence regarding the 2014 incident was admitted not only through Vado's testimony but also through Meyer's testimony. Evidence regarding the 2011 incident was admitted not only through Vado's testimony but also through the testimony of two police officers, as well as a certified copy of the 2011 conviction for attempted reckless discharge of a firearm. Also problematic with respect to the 2011 incident is the lack of connection between Vado's testimony—that defendant told him he "shot at

a guy" in 2011 and "did time for it"—and the facts underlying defendant's actual 2011 conviction—that defendant admitted to discharging a gun accidentally and not in the direction of people or buildings. In sum, given the prejudicial nature of the prior-bad-acts evidence and its limited probative value, admission of the challenged evidence was an abuse of discretion.

¶ 196   Regardless, however, considering the entirety of the record, erroneous admission of the prior-bad-acts evidence was harmless error. Defendant argues that the State must prove the error harmless beyond a reasonable doubt, citing *People v. Cortes*, 181 Ill. 2d 249, 285 (1998) (determining the error was "harmless beyond a reasonable doubt" and stating that "the evidence must be so prejudicial as to deny the defendant a fair trial, *i.e.*, it must have been a material factor in his conviction such that without the evidence the verdict likely would have been different"). The State articulates the same standard, although it omits use of the words "reasonable doubt." Neither party addresses the case law holding that an evidentiary error is harmless where there is no reasonable probability that the jury would have acquitted the defendant absent the error. See, *e.g.*, *In re E.H.*, 224 Ill. 2d 172, 180-81 (2006) (explaining that the harmless-error-review standard for evidentiary issues is the reasonable-probability standard, whereas the harmless-error-review standard for constitutional issues is the beyond-a-reasonable-doubt standard); *People v. McBride*, 2020 IL App (2d) 170873, ¶¶ 34-38 (same); see also *People v. Pelo*, 404 Ill. App. 3d 839, 865-66 (2010) (setting forth the reasonable-probability standard for review of whether erroneous admission of other-crime-evidence was harmless but holding that the "evidentiary error" was harmless even if the beyond-a-reasonable-doubt standard was applied), *abrogated on other grounds by People v. Veach*, 2017 IL 120649, ¶¶ 39, 48.

¶ 197   Under either standard, admission of the prior-bad-acts evidence amounted to harmless error. In addition to Vado's testimony, defendant's conviction was supported by cell-site activation

analysis of phone records and DNA evidence reflecting that the victim was the source of the blood found in the car driven the night of the victim's disappearance. Defendant's cell phone also reflected highly incriminating internet searches. Moreover, on the issue for which the prior-bad-acts evidence was introduced—Vado's alleged fear of defendant—as discussed, there was ample other evidence on the issue. The record does not support a conclusion that the evidence was a material factor in defendant's conviction such that without the evidence, the jury's verdict likely would have been different. Accordingly, based upon our review of the record, the State met its burden of demonstrating that the error was harmless.

¶ 198                        D. Section 2-1401 Petition

¶ 199    Defendant argues that the trial court abused its discretion in granting the State's motion to dismiss and for summary judgment on his section 2-1401 petition. He argues that Vado's posttrial letters to the prosecutors and the trial court judge established a claim of actual innocence warranting an evidentiary hearing. The State responds that Vado's letters were merely cumulative of other trial evidence regarding Vado's immigration status, not a protestation of innocence as to his involvement in the concealment of homicidal death, and not of such a conclusive character that they would probably change the result on retrial.

¶ 200    Section 2-1401 sets forth a comprehensive statutory procedure allowing for the vacatur of a final judgment older than 30 days. 735 ILCS 5/2-1401 (West 2018); *People v. Vincent*, 226 Ill. 2d 1, 7 (2007). "[A]n action brought under section 2-1401 is a civil proceeding and, according to this court's long-standing precedent, is subject to the usual rules of civil practice, even when it is used to challenge a criminal conviction or sentence." *Id.* at 6. In the context of a criminal proceeding, section 2-1401 provides a mechanism "to correct all errors of fact occurring in the prosecution of a cause, unknown to petitioner and the court at the time judgment was entered,

which, if then known, would have prevented its rendition." *People v. Haynes*, 192 Ill. 2d 437, 461 (2000). To obtain relief under section 2-1401, a defendant must provide specific factual allegations to demonstrate the existence of a meritorious defense or claim, due diligence in presenting the defense or claim to the trial court in the original action, and due diligence in filing the section 2-1401 petition. *People v. Pinkonsly*, 207 Ill. 2d 555, 565 (2003). Accordingly, relief under section 2-1401 is "predicated upon proof, by a preponderance of evidence, of a defense or claim that would have precluded entry of the judgment in the original action and diligence in both discovering the defense or claim and presenting the petition." *Vincent*, 226 Ill. 2d at 7-8. The petition must be supported by affidavit or other appropriate showing as to matters not of record. 735 ILCS 5/2-1401(b) (West 2018); *Vincent*, 226 Ill. 2d at 7.

¶ 201    Both parties state that where, as here, the section 2-1401 petition raises a fact-dependent challenge to the judgment, the trial court must exercise its discretion in determining whether the facts warrant relief. See *Warren County Soil & Water Conservation District v. Walters*, 2015 IL 117783, ¶¶ 50-51. Thus, the parties assert, the determination of whether to grant a section 2-1401 petition rests within the sound discretion of the trial court depending upon the facts and equities presented, and the trial court's decision will not be reversed absent an abuse of discretion. *Id.* ¶ 51. The appropriate standard of review, however, is a function of the procedural posture. *Vincent*, 226 Ill. 2d at 14-18. Here, the trial court granted the State's motion to dismiss and for summary judgment on defendant's section 2-1401 petition. There was no evidentiary hearing. Accordingly, we review a ruling in this procedural posture *de novo*. See *People v. Carter*, 2015 IL 117709, ¶ 13 ("We review *de novo* the dismissal of a section 2-1401 petition."); *In re Marriage of Onishi-Chong and Chong*, 2020 IL App (2d) 180824, ¶ 31 (reviewing *de novo* grant of summary judgment on a section 2-1401 petition); *Tuna v. Airbus, S.A.S.*, 2017 IL App (1st) 153645, ¶ 36 (reviewing *de*

*novo* whether any genuine issue of material fact exists that would have prevented summary judgment on a section 2-1401 petition). Regardless of the standard of review, however, defendant presents no basis for reversal, as set forth below.

¶ 202   The basis of defendant's section 2-1401 petition were Vado's postjudgment letters to the prosecutor and the trial court judge seeking assistance in preventing his deportation. In his initial November 13, 2017, letter to the prosecutor, Vado wrote, *inter alia*: "I didn't do anything wrong[.] I did everything you guys ask me to do everything[.] I fully cooperate with you guys[.] I never hide nothing from you guys, I always try my best to help you guys everything hurt being here in jail, being apart from my kids hurt me so bad[.] [P]lease stop punish me and my family with all this I understand that I was involve in this crime but I think I prove you guys that I am innocent of everything I have the chance to hide or move the state if I want but I never did I am innocent[.]" In subsequent letters, Vado wrote: "I didn't expect all my letters to be ignored after being so helpful to the law and helping the county of Kane catch a real killer." He also wrote: "I am being punished just for being a witness of a murder crime scene. I fully co-operated with all that asked of me without holding anything back. Even though I did not part take in this situation I was force to be there. I am being listed as if I was the murder at the scene."[2]

¶ 203   Defendant contends that in the letters, Vado asserts his innocence in the underlying case— an assertion that contradicts Vado's plea of guilty to concealment of a homicidal death. According to defendant, the letters therefore constituted newly discovered evidence of defendant's innocence warranting a new trial. A claim of actual innocence may be raised in a section 2-1401 petition.

---

[2] Vado's first letter to the prosecutor was signed and notarized but not sworn to, as was his letter to the trial court judge. His other letters were signed only.

*People v. Boclair*, 202 Ill. 2d 89, 102 (2002). To establish an actual innocence claim, the evidence must be: (1) newly discovered; (2) material and not merely cumulative; and (3) of such conclusive character that it would probably change the result on retrial. *People v. Robinson*, 2020 IL 123849, ¶ 47 (citing *People v. Edwards*, 2012 IL 111711, ¶ 32). The conclusive character of the new evidence "refers to evidence that, when considered along with the trial evidence, would probably lead to a different result" and is "the most important element of an actual innocence claim." *Id.* The ultimate question is whether the newly discovered evidence "places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *Id.* ¶ 48. In short, "[p]robability, rather than certainty, is the key in considering whether the fact finder would reach a different result after considering the prior evidence along with the new evidence." *Id.*

¶ 204   A review of the record demonstrates that the trial court did not err in determining that Vado's letters did not amount to newly discovered evidence of actual innocence. Even if the evidence were newly discovered, the evidence was not material or of such conclusive character that it would probably change the result on retrial. See *id.* ¶ 47. In addition to finding the section 2-1401 petition "rife with conclusory allegations," the trial court rejected the argument that Vado's letters contradicted his guilty plea and trial testimony. Rather, "the jury was apprised of [Vado's] agreement and his plea and heard his explanation under direct and cross-examination," and Vado "maintained his innocence of the concealment even at trial." The trial court also pointed out the extensive corroboration of Vado's testimony at trial. Although the trial court dismissed the 2-1401 petition, it also held that the State was entitled to summary judgment on the petition based upon its finding that Vado's letters did not "contradict let alone recant his trial testimony." Based upon our review of the record, we cannot say that the trial court's decision was erroneous. There was nothing in the letters that contradicted Vado's guilty plea or trial testimony. The entirety of the

letters reflects Vado's assertion of innocence of the murder, not of his involvement in the concealment of a homicidal death.

¶ 205    As a final matter, defendant also contends that the letters "strongly implied that, contrary to his trial testimony, [Vado] had been promised some sort of immunity from deportation if he testified against [defendant]." Defendant represents that he raised a *Brady* claim in his section 2-1401 petition based upon the letters. However, what defendant alleged in his section 2-1401 petition was that, "During his testimony, Vado also claimed that there was an agreement that he would not be deported following his testimony, although no such agreement was tendered to the defense or acknowledged by the prosecution." As the trial court found, and as the record demonstrates, this allegation was simply "false as shown by the transcript of Vado's testimony." There were no other assertions regarding the existence of such an agreement, and defendant articulates no basis for reversal of the trial court's grant of the State's motion to dismiss and for summary judgment on defendant's section 2-1401 petition.

¶ 206                                          III. CONCLUSION

¶ 207    For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 208    Affirmed.